ASSOCIATION OF OWNERS OF KUKUI PLAZA, an unincorporated Hawaii association, by its Board of Directors, Plaintiff-Appellee, *v.* CITY AND COUNTY OF HONOLULU, Defendant-Appellant and Third-Party Plaintiff, *v.* WILLIAM M. HALES, JR., in his capacity as Trustee of the Liquidating Trust for Shareholders of Oceanside Properties, Inc., Third-Party Defendant

NO. 11065

(CIVIL NO. 77387)

SEPTEMBER 9, 1987

BURNS, C.J., HEEN AND TANAKA, JJ.

## OPINION OF THE COURT BY HEEN, J.

Defendant-Appellant City and County of Honolulu (City) appeals from the permanent injunction issued against it by the circuit court.[1] We generally affirm, but remand with instructions to amend the injunction consistent with this opinion.

### I.

The dispute here is whether, under the amended declaration of horizontal property regime for the Kukui Plaza condominium (Kukui Plaza), the City is required to make the parking stalls owned by it within Kukui Plaza available to the public at municipal parking rates, and whether the provision of paragraph 8.0 (paragraph 8.0) of the amended declaration regarding the transfer of parking stalls in Kukui Plaza is unenforceable as a restraint on alienation.[2] A detailed review of the development of Kukui Plaza is necessary to a resolution of the issues.

---

[1] By stipulation of all the parties, the third-party complaint brought by the City against William M. Hales, Jr., Trustee of the Liquidating Trust for Shareholders of Oceanside Properties, Inc., was dismissed with prejudice.

[2] The full text of paragraph 8.0 of the amended declaration is as follows:

8.0 *ALTERATION AND TRANSFER OF INTEREST.* The common interest and easements appurtenant to each unit shall have a permanent character and shall not be altered without the consent of all owners of units affected thereby as expressed in an amendment to this Declaration duly recorded and shall not be separated from such unit and shall be deemed conveyed or encumbered with such unit even though not expressly mentioned or described in the conveyance or other instrument. A commercial space contiguous to another commercial space may be combined and used as a combined area. A commercial space may be partitioned for different commercial uses and different owners. *A parking stall may be separately sold, leased, conveyed or otherwise transferred as a separate unit but only to an owner of an apartment unit, a commercial space unit or the City.* The common elements shall remain undivided and no right shall exist to partition or divide any parts thereof as provided by the Horizontal Property Act. [Emphasis added.]

The emphasized sentence of paragraph 8.0 is the provision in dispute.

On June 21, 1972, the City, as the owner of Block G of the Kukui Urban Renewal Project (Block G), leased the property to the Honolulu Redevelopment Agency (HRA), a municipal agency with separate legal corporate status (HRA lease). The HRA lease is recorded and provides for HRA to enter into an agreement with a private developer for construction of a condominium project on Block G. The HRA lease also provides for the City and HRA to submit Block G to a horizontal property regime (HPR) under the Horizontal Property Act (HPA). Hawaii Revised Statutes (HRS) chapter 514A (1985).

In the HRA lease the City reserves the right

to acquire from any subsequent sublessee of [HRA] reasonable amounts of parking areas for municipal purposes at a cost consistent with the other elements of the project[.]

The HRA lease further requires that any development agreement entered into by HRA with a developer must include provisions for condominium leases for "an off-street parking lease; commercial space lease, and condominium apartment leases[.]" In pertinent part the HRA lease also requires the development agreement to describe the project as follows:

[A] mixed-use leasehold condominium project containing a commercial mall, off-street parking structures, and residential apartment units. There will be approximately 900 apartment units, 1,800 off-street parking spaces, of which at least 900 public parking stalls will be made available at municipal rates and 60,000 to 80,000 square feet of commercial space on the two levels.

However, when HRA and Oceanside Properties, Inc. (Oceanside), a Hawaii corporation, entered into an agreement (development agreement) on August 8, 1972, under which Oceanside was to construct the project, the development agreement stated, *inter alia*, that the 900 public parking stalls would be made available at municipal rates, "provided that municipal financing is available to fund the entire cost of said 900 public parking spaces[.]" The development agreement was cancelled on January 14, 1976, when the building was completed.

On March 28, 1973, HRA entered into a "Master Sublease"

(master sublease) with Oceanside providing for the creation of an HPR consisting of commercial, residential, and off-street parking units. The master sublease does not provide for parking at municipal rates; however, the master sublease is specifically made subject to all the terms, conditions, and limitations of the HRA lease.

An amendment to the master sublease (amended sublease) effective September 21, 1973, provides that the premises will be used for a "mixed-use leasehold project including, but not limited to, commercial use, off-street parking use and residential apartment use." Public parking units are not provided for. The amended sublease remains subject to the terms, conditions and limitations of the HRA lease.

On March 24, 1974, the City, HRA, and Oceanside, as the owners of "all of the interests" in Block G, jointly recorded a "Declaration Of Horizontal Property Regime Kukui Plaza" (declaration).[3] The declaration divides the project into "freehold estates" or "units" consisting of "apartments, parking stalls and commercial spaces which may be sold, leased, transferred, encumbered or otherwise disposed of[,]" and assigns each unit a percentage interest in the common elements, including the land.[4] The declaration establishes 1,811 parking stalls and, although it does not set aside any of the parking stalls for public parking, it specifically reserves 900 of them for the City.[5]

---

[3] Hawaii Revised Statutes (HRS) § 514A-20 (1985) provides for the establishment of a horizontal property regime upon the recordation of a master lease and a declaration by the owners and the lessees indicating their desire to submit the property to the horizontal property regime provided for in chapter 514A.

[4] Under HRS § 514A-3 (1985) the common elements of a horizontal property regime include the land, whether leased or in fee simple, unless otherwise provided in the declaration.

[5] Of the 908 apartment units established by the declaration, 227 are government subsidized units set aside for low- to moderate-income families. Certain parking stalls were made appurtenant to the non-subsidized apartment units, but the subsidized units did not have appurtenant parking stalls. Under paragraph 8.0 of the declaration, appurtenant parking stalls could not be conveyed separately from the apartment to which they were appurtenant. The parking stalls that were not appurtenant to an apartment unit could "be separately sold, leased, conveyed or otherwise transferred as a separate unit."

The bylaws[6] filed with the declaration provide that, while the association's board of directors may establish garage rules governing the privately owned parking stalls, the City is authorized to adopt its own parking rules for its portion of the garage.

On April 17, 1974, prior to completion of construction, the Real Estate Commission issued the final report (final report) on the project.[7] The final report notes that

> [t]he Declaration of Horizontal Property Regime reflects that the City and County of Honolulu has been allocated 900 parking stalls, thus having 6.453 percent of undivided interest in the common elements.

On January 15, 1976, upon completion of the project, a Second Amended Declaration Of Horizontal Property Regime Of Kukui Plaza (amended declaration) consolidating the provisions of the declaration and a prior first amendment[8] was filed by Oceanside and the City, HRA having gone out of existence in 1975 and the City having succeeded to HRA's interest in the project.[9] The amended declaration describes the project as composed of freehold

---

[6] HRS § 514A-81 requires the bylaws governing the operation of the horizontal property regime to be filed in the same manner as the declaration.

[7] Prior to offering a condominium project for sale the developer is required to notify the real estate commission (commission), HRS § 514A-31, which may inspect the project. HRS § 514A-33. If the commission inspects the project it is required to issue a public report of its findings. HRS § 514A-36. The commission may issue a final report prior to completion of construction of a condominium project only if the developer has filed with the commission all of the information and documents required by HRS § 514A-40. The developer is prohibited from entering into a contract or agreement for the sale of an apartment which is binding on a prospective buyer until a copy of the commission's final report has been delivered to the purchaser. HRS § 514A-62.

[8] The first amended declaration is not in the record.

[9] The evidence indicates that the Kukui Plaza units were being sold in 1974 and 1975 during construction of the building, and some of the owners occupied their units in February 1976. However, the amended declaration states that the City and Oceanside were the sole owners of all the interests in the property. If some of the apartments were sold prior to the filing of the amended declaration, query whether the City and Oceanside owned the requisite 75% of the interests in the common elements that the original declaration established as necessary to amend it. HRS § 514A-11(11).

estates of 908 apartment units, 1,807[10] parking stall units, and 30 commercial space units. Each parking stall is declared to be a separate unit with an assigned undivided interest in the common elements. No parking stalls are declared appurtenant to any residential or commercial units and none are set aside for public parking or reserved for the City. The land on which the project sits is designated as a common element and is specifically described as being subject to "[t]he terms and conditions of that certain HRA lease dated June 21, 1972[.]"

Under the amended declaration, paragraph 8.0 is amended to provide, *inter alia,* that each parking stall may be "sold, leased, conveyed or otherwise transferred as a separate unit but only to an owner of an apartment or commercial unit or to the City."[11] The validity of that provision of paragraph 8.0 is the bone of contention between the parties.

The bylaws filed with the amended declaration provide that any garage rules adopted by the condominium's board of directors are not applicable to parking stall units owned by the City.

A supplementary public report on the project issued on January 16, 1976, in accordance with HRS § 514A-41, reflects the provisions of the amended declaration and does not mention any reservation of parking stalls for the City.

Kukui Plaza was completed in January 1976. Sales promotion began in April 1974 and, according to a letter in evidence from Oceanside's president to prospective purchasers, public sales began on May 1, 1974. Parking stalls on the top three of the five parking levels in Kukui Plaza were offered for sale to, and some were purchased by, the apartment and commercial space buyers. Oceanside retained title to the parking stalls on the two lower parking levels and any unsold stalls on the upper parking levels. Several sales brochures and newspaper articles introduced in evidence at the trial refer to the fact that 900 parking stalls were to be made available to the public at municipal rates. Kukui Plaza's sales promotion

---

[10] Four of the parking stalls were eliminated during construction to accommodate design changes in the vehicular ramps.

[11] No amendments were made to the remainder of paragraph 8.0. *See* footnote 2, *supra,* for the complete text of paragraph 8.0, as amended.

emphasized the public parking as one of its outstanding features.

In 1978 Oceanside filed a chapter 11 bankruptcy petition and, as a part of the bankruptcy proceeding, a settlement was reached between the City and Oceanside resolving their dispute over "ownership and other rights" regarding "certain 859 public parking stalls"[12] in the project.

Under the settlement agreement, dated November 22, 1982, the City agreed to purchase the 859 parking stalls at a "base purchase price" of $3,450,000,[13] by means of a cash down payment[14] and a promissory note for the balance, secured by a mortgage on the parking stalls and an assignment to Oceanside of any rents derived from the parking stalls. Additionally, the settlement agreement provides that the City is to sell all of the 859 parking stalls, retaining only a sufficient number to satisfy the Comprehensive Zoning Code requirements for the commercial units. The stalls were first offered to Kukui Plaza's apartment and commercial unit owners, some of whom purchased one or more. The rest of the City-owned stalls are rented through a concessionaire to the general public at current municipal rates.

On March 4, 1983, the City and Oceanside, through its president, William M. Hales, Jr., amended the HRA lease by deleting, *inter alia,* the provision regarding public parking stalls.

The instant action was brought by the Association of Owners of Kukui Plaza (Association) to enjoin the City from selling the remaining parking stalls to the general public in violation of paragraph 8.0 of the amended declaration.

Following a bench trial the lower court issued its Findings of Fact, Conclusions of Law and Order. The lower court held that when the City acquired the 859 parking stall units it was bound by paragraph 8.0 of the amended declaration. It also held that, be-

---

[12] Thirty-seven of the original 900 stalls had previously been sold by Oceanside, and four of the stalls had been eliminated during construction to accommodate design changes in the vehicular ramps.

[13] The settlement agreement provides for a downward adjustment in the purchase price to account for the net proceeds realized by Oceanside from the prior sale of 37 parking stalls, and an upward adjustment for delays in closing, unless the delay is beyond the control of the City.

[14] The settlement agreement provides for an independent appraisal of the market value of 163 of the parking stalls in order to determine the cash down payment.

cause of representations made by the City and its "apparent co-venturer" Oceanside in the sales brochures and the publicity regarding the project that 900 parking spaces would be available at municipal rates, the City was estopped from asserting it had a right to sell the parking stalls.

The City contends (1) that it cannot be estopped from denying that it is obligated to restrict the use of its stalls to public parking at municipal rates, and (2) that paragraph 8.0 of the amended declaration is invalid as an unreasonable restraint on alienation. We disagree with the City on both issues.

## II.

The City argues that the only representations regarding municipal parking were made by Oceanside's sales promotion materials or in the newspaper articles and, since none of the recorded condominium documents indicates that public parking will be provided permanently in Kukui Plaza, the trial court erred in holding that the City was estopped from asserting a right to sell its parking stalls. The City contends that it made no representations upon which the buyers could have relied and it should not be restricted in the use or disposition of its property. In response, Association argues that the declaration's allocation of the 900 stalls was the City's representation that its parking stalls would be made available to the public at municipal rates, and that the representation was reasonably relied upon by purchasers of units in Kukui Plaza.

Neither of the parties seems to recognize the impact of the HPA on the circumstances of this case. In our view the HPA, our construction of which "must be imaginative and progressive rather than restrictive[,]" *State Savings and Loan Ass'n v. Kauaian Development Co., Inc.*, 50 Haw. 540, 552, 445 P.2d 109, 119 (1968) (Kauaian I), stands as a barrier to the City's unrestricted use or transfer of its stalls.

## A.

The purpose of the HPA is to protect the buying public and to create a better reception by that public for the condominium developer's product. *Kauaian I, supra.* To achieve that purpose the

HPA regulates the conduct and activities of the developer in the development and sale of condominium units and is designed to ensure that the utmost information is made available to prospective buyers. *Id.; Breene v. Plaza Tower Ass'n,* 310 N.W.2d 730 (N.D. 1981).

Thus, HRS § 514A-20 requires all the owners, including lessees, of the property to be dedicated to an HPR to join in the declaration of HPR, and HRS § 514A-11 requires the declaration to include extensive and detailed information regarding the project, including a description of the land, and whether it is leased or in fee simple. "[T]he declaration [is] the operative document creating [the] horizontal property regime and . . . it subdivide[s] the declarant's interest in the land horizontally as well as vertically." *Kauaian I,* 50 Haw. at 548, 445 P.2d at 116. Since, under HRS § 514A-20, the owners of all the interests in the land are "declarants" and have subjected their interests to the HPA, the provisions of a lease encumbering the property are an integral part of the HPR, and the rights and obligations of the landowner, the developer, and the purchasers are governed as much by the lease provisions as by the declaration itself. *See State Savings and Loan Ass'n v. Kauaian Development Co., Inc.,* 62 Haw. 188, 613 P.2d 1315 (1980) (Kauaian II); *see also Wolinsky v. Kadison,* 114 Ill. App. 3d 527, 70 Ill. Dec. 277, 449 N.E.2d 151 (1983); *Breene v. Plaza Tower Ass'n, supra; Wiley v. Berg,* 282 Or. 9, 578 P.2d 384 (1978).

B.

When the City, HRA, and Oceanside established the HPR they subjected the land, the HRA lease, and the master sublease to the HPA. HRS § 514A-20. All the documents relating to Kukui Plaza were recorded in the Bureau of Conveyances. When Kukui Plaza units were sold, the buyers were all on notice of the recorded HRA lease provisions stating that the City had the right to acquire parking areas in the project and that at least 900 of the parking stalls would be used for municipal parking at municipal rates.[15] *Packag-*

---

[15] Although the HRA lease gives the City the right to acquire the parking stalls for municipal purposes, which could encompass purposes other than "public" parking, we construe the pertinent provisions to restrict the purpose of the parking stalls to parking by the general public.

*ing Products Co., Ltd. v. Teruya Bros., Ltd.*, 58 Haw. 580, 574 P.2d 524 (1978). Those provisions notified the purchasers of the City's rights and intentions, and were not removed from the HRA lease until March 4, 1983, when they were deleted by the City and Oceanside. That notice was buttressed by the declaration's statement that 900 parking stalls were reserved for the City, and again by the notation in the final report of the reservation of the 900 parking stalls. A copy of the final report was required to be furnished to every prospective purchaser before a binding contract could be executed. HRS § 514A-62. Thus, prior to January 16, 1976, when the amended declaration was filed, every prospective purchaser was aware of the HRA lease provisions and the declaration's reservation.

After the amended declaration was filed on January 16, 1976, the municipal parking provisions of the HRA lease remained and were not removed until March 4, 1983. The land is specifically described in the amended declaration as subject to the terms and provisions of the HRA lease, and there is nothing in the amended declaration that expressly or impliedly negatives that lease's municipal parking provisions. Therefore, even after the amended declaration was filed, purchasers were still on notice of the City's rights under the HRA lease and could reasonably rely on its municipal parking provisions as a statement that the City intended to operate its stalls as a municipal parking lot. The belief that the City intended to maintain such an operation is reinforced by the recorded bylaws provision giving the City complete authority to regulate the use of its own parking stalls.

It was clearly the City's intent from the outset of the project to acquire a number of parking stalls for the operation of a municipal parking lot. In this regard we take judicial notice that when the HRA lease was executed the City's policy for downtown Honolulu included providing more municipal off-street parking facilities as a means of assisting in the downtown area's economic rehabilitation. Requiring the developer to provide an excess number of parking stalls in the Kukui Plaza which would eventually be owned by the City was in line with that overall policy. The Mayor of Honolulu testified that the City had intended to provide "permanent" parking for people who lived, worked and played in downtown Hono-

lulu, and that the parking stalls were originally intended to be consideration to the City for leasing Block "G" to Oceanside for $1.00 a year. Construing all the documents as a whole, *Wolinsky v. Kadison, supra,* we are convinced that the City and Oceanside expected that at least 900 Kukui Plaza parking stalls would eventually be owned by the City. It appears that the amended paragraph 8.0 is intended to protect that expectation.

The sales brochures and the newspaper articles clearly were the direct outgrowth of the City's representations in the HRA lease and the declaration that parking stalls not owned by apartment or commercial unit owners in Kukui Plaza would be owned by the City and used for municipal parking at municipal rates. The City's argument that the purchasers could not have relied on any representations from the City is not persuasive in view of the above facts and the HPA.

> The statutory provisions relating to condominiums requires that the declaration of condominium, the restrictions, and the bylaws must be recorded in the office of the register of deeds in the county where the property is located. NDCC §§ 47-04.1-02, 47-04.1-04, 47-04.1-07. These statutory provisions contemplate a method to put prospective purchasers and owners on notice as to the restrictions and bylaws which affect their interest in the property. A prospective purchaser's decision to buy a particular unit in a condominium may be based upon the recorded restrictions which encumber that unit.

*Breene v. Plaza Tower Ass'n,* 310 N.W.2d at 733. In the light of the purposes of the HPA, the City is not at liberty to disavow the developer's representations, or its own recorded representations.

Under the circumstances of this case, if we were to hold that the City is not bound by the representations made by the developer that municipal parking would be provided in Kukui Plaza at municipal rates, we would be violating the purposes of the HPA, and would be establishing a precedent seriously impairing the statutory objective of protecting the condominium buyer. A condominium purchaser who relies on the representations of a developer which correctly reflect the intent of the landowner as expressed in the recorded ground lease would be without means to protect his interest in the ground lease if the landowner were to be allowed to

abandon his intent and disavow the developer's representations. The landowner has a direct and substantial interest in the success of the project and, where his recorded representations have given rise to a sales program based on those representations, to allow him to withdraw those recorded representations or act contrary to them would be destructive of the HPA's legislative purpose.

In light of the above discussion, we hold that the City may not use the parking stalls it now owns or may own in the future, except for 343 stalls acquired by the City with federal funds in two increments in 1982 and 1984,[16] for anything except public parking at municipal rates.[17]

We turn now to the question of the validity of the alienation provision of paragraph 8.0 of the amended declaration.

### III.

The general rule is that restraints on alienation are not favored by the law, 61 Am. Jur. 2d, *Perpetuities and Restraints on Alienation,* § 100 (1981), and are uniformly held to be void. *Pacific Trust Co. v. Nagamori,* 32 Haw. 323 (1931). The reason for the rule against restraints on alienation is a public policy favoring freedom of commerce in property, *see Gale v. York Center Community Cooperative, Inc.,* 21 Ill.2d 86, 171 N.E.2d 30 (1960), and "the idea that the free alienability of property fosters economic and commercial development." *Seagate Condominium Ass'n, Inc. v. Duffy,* 330 So.2d 484, 485

---

[16] The record shows that the City acquired 343 stalls, 163 in 1982 and 180 in 1984, for the purpose of providing rental parking to low- and moderate-income residents of Kukui Plaza and the surrounding neighborhood, including a nearby apartment building containing low- and moderate-income units. Since their use and disposition are governed by federal regulations, they cannot be affected by our decision. They are rented at less than the municipal rate.

[17] Under the amended declaration the City may buy from or sell individual parking stalls to other residential or commercial unit owners. *See* part III of the opinion, *infra.* Thus, we do not consider that the City is required to maintain 900 public parking spaces at all times. However, whatever number of parking stalls the City owns, they must be used for public parking at municipal rates, except for the 343 federally funded stalls. Also, upon sale of parking stalls by the City to other residential or commercial unit owners, those stalls will not be subject to the public parking at municipal rates requirement. Otherwise, their alienation will be unreasonably restrained. *See* part III, *infra.*

(Fla. Dist. Ct. App. 1976). However, such restraints may be upheld in circumstances where they may be found to be reasonable. *Kahanaiki v. Kohala Sugar Co.*, 6 Haw. 694 (1888); 61 Am. Jur. 2d, *supra*, § 102. And

> [b]ecause "[t]he validity or invalidity of a restraint depends upon its long-term effect on the improvement and marketability of the property," *Iglehart v. Phillips*, 383 So.2d 610, 614 (Fla. 1980), where the restraint, for whatever duration, does not impede the improvement of the property or its marketability, it is not illegal. *Id.* at 615.

*Aquarian Foundation, Inc. v. Sholom House, Inc.*, 448 So.2d 1166, 1168 (Fla. Dist. Ct. App. 1984).

The uniqueness of the condominium concept of ownership has caused the law to recognize that each unit owner must give up some degree of "freedom of choice he might otherwise enjoy in separate, privately owned property." *Id.* at 1167. The aims of a condominium development's attempt to control alienation of its units are: "first, to reduce the risk of financial interdependence by excluding the economically unreliable; second, to promote the project's inner harmony by striving for compatible members." C.J. Berger, *Condominium: Shelter On A Statutory Foundation*, 63 Colum. L. Rev. 987, 1018 (1963). Consequently, courts dealing with a condominium owner's right to transfer his property recognize that certain restrictions on transfers of the condominium unit are valid means for the owners' association to control the overall composition of the condominium. *Aquarian Foundation, Inc. v. Sholom House, Inc., supra.* However, where the restrictions constitute restraints on alienation, the uniqueness of the condominium concept does not overcome the requirement that the restraints must be reasonable. *Aquarian Foundation, Inc. v. Sholom House, Inc., supra; see also Laguna Royale Owners Ass'n v. Darger*, 119 Cal. App. 3d 670, 174 Cal. Rptr. 136 (1981).

Courts have traditionally determined reasonableness of restraints on alienation by examining the duration of the restraint and the size of the class which it excludes. *Seagate Condominium Ass'n, Inc. v. Duffy, supra.* "In determining whether a restraint on alienation is reasonable, court [sic] will consider not only the justification for enforcing the particular restraint, but also the quantum

of the restraint — the practical effect on alienation which would result from enforcement of the restraint." 61 Am. Jur. 2d, *supra*, § 102.

However, it has been held that,

> it would appear that the crucial inquiry should be directed at the utility of the restraint as compared with the injurious consequences that will flow from its enforcement. If accepted social and economic considerations dictate that a partial restraint is reasonably necessary for their fulfillment, such a restraint should be sustained. No restraint should be sustained simply because it is limited in time, or the class of persons excluded is not total, or all modes of alienation are not prohibited. These qualifications lessen the degree to which restraints violate general public policy against restraining alienation of property and should be considered to that extent; but they are not, in themselves, sufficient to overcome it. In short, the law of property, like other areas of the law, is not a mathematical science but takes shape at the direction of social and economic forces in an ever changing society, and decisions should be made to turn on these considerations.

*Gale v. York Center Community Cooperative, Inc.*, 21 Ill. 2d at 90, 171 N.E.2d at 33.[18]

The interest of condominium unit owners in protecting the ownership of the common areas and the underlying land requires that a restraint on alienation contained in a condominium declara-

---

[18] *Gale v. York Center Community Cooperative, Inc.*, 21 Ill.2d 86, 171 N.E.2d 30 (1961), involved a cooperative housing association in which the title to the property on which the housing units were located was owned by the defendant non-profit corporation. A membership share in the corporation entitled the owner to perpetual use and occupancy of a particular dwelling. The membership agreement provided that a member's share could not be transferred until he or she had given notice to the association and the association had had the opportunity to purchase the membership.

We have found no cases involving condominiums or cooperatives in which a restraint in any way similar to the one at issue in the case at bar was involved. It appears that condominium developers, borrowing from the experience of cooperative developers, have made no efforts to invoke restraints of this sort in condominiums and have resorted mostly to so-called right of first refusals. *See* O.L. Browder, *Restraints On The Alienation Of Condominium Units* (The Right of First Refusal), 2 U. Ill. L. F. 231 (1970).

tion or in the bylaws be analyzed in the light of the realities of contemporary commerce and economics. *Anderson v. 50 East 72nd St. Condominium,* 119 A.D.2d 73, 505 N.Y.S.2d 101 (1986). Rules against restraints on alienation were devised long before the recently developed concept of property ownership represented by the condominium. Therefore, it is questionable whether those rules may be accorded unmitigated supremacy in light of the new ownership concepts. *See id.* And courts have not applied the rule against restraints on alienation where its policy purposes will not be served, or where the purpose of the restraint is to serve public policies that outweigh the policies promoted by the rule. *Cambridge v. East Slope Inv. Corp.,* 700 P.2d 537 (Colo. 1985).

We subscribe to the reasoning of *Gale* and will not slavishly apply the common-law rules regarding restraints on alienation as absolute rules of public policy, but will examine the restraint in this case in the light of the modern day concept of condominium ownership, *Franklin v. Spadafora,* 388 Mass. 764, 447 N.E.2d 1244, 39 A.L.R.4th 77 (1983); *Anderson v. 50 East 72nd St. Condominium, supra,* and determine its reasonableness in the light of the totality of circumstances, considering "the respective interests of the parties and the duration and nature of the restraint used to enforce those interests."[19] *Perry v. Brundage,* 200 Colo. 229, 235, 614 P.2d 362, 367 (1980). *Accord Malouff v. Midland Federal Savings and Loan Ass'n,* 181 Colo. 294, 509 P.2d 1240 (1973).

We note first that the HPA represents adoption in this jurisdiction of the modern concept of condominium ownership,[20] and a decision upholding the validity of paragraph 8.0 would be consonant with the legislative policy of the HPA as discussed in II, A, *supra.*

The history and nature of Kukui Plaza, and the legislative pur-

---

[19] We reject the City's argument that paragraph 8.0 creates a future interest that violates the rule against perpetuities. Since the amended declaration and the bylaws may be amended at any time, the restraint is not unlimited. *Seagate Condominium Ass'n v. Duffy,* 330 So.2d 484 (Fla. Dist. Ct. App. 1976); *Franklin v. Spadafora,* 388 Mass. 764, 447 N.E.2d 1244 (1983).

[20] Hawaii was the first state to enact a statute for the creation of horizontal property regimes. *State Savings and Loan Ass'n v. Kauaian Development Co., Inc.,* 50 Haw. 540, 546 n.8, 445 P.2d 109, 115 n.8 (1968).

pose of the HPA, compel us to the view that the restraint in paragraph 8.0 serves to promote the justifiable interests of its unit owners and is not destructive of the policy underpinnings of the rule against restraints on alienation. The property is already developed to its fullest extent, and although paragraph 8.0 imposes practical restraints on alienation, those restraints are not unreasonable in light of the City's involvement with Kukui Plaza's development and the interests of the parties under the HPA.

Paragraph 8.0 unquestionably restricts alienation of the parking stalls, since the only possible purchasers are the residential and commercial unit owners and the City. In the extreme, the City or another unit owner could conceivably end up owning all the parking stalls. On the other hand, if paragraph 8.0's alienation provision were struck down, the parking stalls could be transferred to 1,807 individuals who have no other connection with Kukui Plaza.[21] The latter situation could be destructive of the interests of the residential and commercial unit owners. The interest of an individual "absentee" parking stall owner in matters affecting the condominium would be minimal, and the Association, charged with paying the expenses of maintaining the common areas, could experience considerable difficulty collecting the monthly maintenance charges or special assessments from those owners. This could lead to considerable litigation and additional expense for the unit owners. Additionally, the 1,807 "absentee" owners would also own a combined percentage of 12.984940% of the common elements. Such a percentage, if the owners were to band together, could take on formidable proportions at a general meeting of the Association. In our view, paragraph 8.0 serves a public policy of maintaining the smooth and efficient operation of the condominium, protecting the interests of the unit owners, and preventing a burgeoning of litigation.

---

[21] The trial testimony indicates that as a matter of policy the Association does not allow the transfer of a parking stall separately from a residential or commercial unit. Whether that policy is legally enforceable is questionable. In any event, the policy may have to change in view of the fact that some residential or commercial unit owners, having purchased additional stalls, may, within the constraints of paragraph 8.0, wish to dispose of one or more of them as separate units.

Moreover, a decision establishing paragraph 8.0's validity would be supportive of the public policies giving rise to Kukui Plaza's unique nature. At the time of Kukui Plaza's development, affordable housing and public parking for downtown Honolulu were important to the welfare of the community. The purpose of paragraph 8.0 is to ensure the continuation of the social objective of providing public parking in Kukui Plaza at municipal rates. The mere passage of time has not detracted from the utility of that social objective and there is nothing in the record to indicate that downtown municipal parking is not now a desirable social end.[22]

For the foregoing reasons, we hold that the alienation provision of paragraph 8.0 of the amended declaration is valid and enforceable against the City and all the owners of parking stalls in the Kukui Plaza. The restriction is applicable not only to the stalls acquired by the City from Oceanside but to all the parking stalls whenever and by whomever acquired, with the exception of the 343 parking stalls purchased by the City with federal funds. Their disposition is governed by federal regulations.[23]

We strongly emphasize that our holding is strictly limited to the facts in this case. As stated above it is the City's involvement in Kukui Plaza's development, taken in the light of the legislative purpose of the HPA, which brings about the result at hand. The same kind of restraint in other circumstances may not be accorded the same treatment.[24]

## IV.

We hold that the lower court's issuance of the injunction in this case was not in error; however, we agree with the City's argument that the injunction is ambiguous, although in view of the facts of this case there can be no doubt that the lower court intended that the City was to be prevented from selling, leasing, conveying or

---

[22] Affordable housing remains of unquestionable importance to this community.

[23] *See* footnote 16, *supra.*

[24] We note that the amended declaration and bylaws provide the mechanism for their amendment and it is still possible for the parties to reach an accommodation between the interests of the Association and the desire of the City to sell its stalls.

otherwise transferring its parking stalls to any person or persons except owners of a residential or commercial unit in Kukui Plaza.[25]

Consequently, we remand this matter to the trial court with instructions to amend the injunction to make it clear that the City is enjoined from selling, leasing, conveying or otherwise transferring any of the 859 parking stalls it acquired from Oceanside in the settlement agreement, or any parking stalls it has otherwise acquired, or may acquire in the future, with the exception of the parking stalls acquired with federal funds, to any person or persons other than an owner or owners of another residential or commercial unit in Kukui Plaza.

Remanded for further proceedings consistent with this opinion.

*Randolph R. Slaton (Stanley K. Yamada, Jr.,* with him on the briefs; *Williams, Slaton & Yamada* of counsel) for City and County of Honolulu.

*G. Stephen Elisha (Mark T. Ichiyama* and *Richard S. Ekimoto* with him on the brief; *(Dinman, Nakamura, Elisha & Nakatani* of counsel) for Association of Owners of Kukui Plaza.

---

[25] The order of injunction reads as follows:

ORDER

IT IS HEREBY ORDERED (based upon the foregoing findings of fact, conclusions of law and discussion) that the Defendant be permanently enjoined from selling (leasing, conveying or otherwise transferring) as a separate unit owner, a commercial unit owner or the City, in contravention of Section 8.0, Second Amended Declaration of Horizontal Property Regime, for the term of the lease agreement between the City and the HRA.