116 P.3d 644

**ASSOCIATION OF APARTMENT OWN-
ERS OF MAALAEA KAI, INC., Plain-
tiff/Counterclaim Defendant–Appellant**

v.

**Thomas Hayden STILLSON; Phyllis Ann
Payne–Stillson, fka Phyllis Ann Payne,
Defendants/Counterclaimants–Appellees**

and

**Pioneer Federal Savings Bank; John Does
1–50; Jane Does 1–50; Doe Partnerships
1–50; Doe Corporations 1–50; Doe Enti-
ties 1–50 and Doe Governmental Units
1–50, Defendants (Nos. 23932 & 24257).**

No. 23932.

Supreme Court of Hawai'i.

July 22, 2005.

Kevin P.H. Sumida and Lance S. Au (Matsui Chung Sumida & Tsuchiyama), Honolulu, on the briefs, for plaintiff/counterclaim defendant-appellant.

Dennis Niles, William M. McKeon and Tom Pierce (Paul, Johnson, Park & Niles), Wailuku, on the briefs, for defendants/counterclaimants-appellees.

LEVINSON, ACOBA, and DUFFY, JJ.; and NAKAYAMA, J., dissenting, with whom MOON, C.J., joins.

Opinion of the Court by ACOBA, J.

We hold (1) Hawai'i Revised Statutes (HRS) § 514C–6(a) requires lessees of condominium units to which 75% of the common interests are appurtenant to approve of a leased fee purchase, (2) because HRS § 514C–6(a) is silent on the method of calculating the votes of multi-owner units, the bylaws of an association of apartment owners may govern on how the votes are to be calculated so long as not violative of any law, (3) if any defects affected the approval process, the 75% requirement was satisfied by the lessees' subsequent ratification of the previous vote when they executed deeds necessary for conversion, and (4) pursuant to HRS § 514C–6(a)(3), an association of apartment owners may assess a "conversion" surcharge in "a fair and equitable manner" against lessees who oppose the fee purchase.

Because the November 29, 2000 order of the Circuit Court of the Second Circuit [1] (the court) granting partial summary judgment to Defendants/Counterclaimants–Appellees Thomas Hayden Stillson and Phyllis Ann Payne–Stillson (collectively, the Stillsons), who opposed the leased fee purchase of the

---

1. The Honorable Shackley F. Raffetto presided.

Maalaea Kai condominium, did not comport with the representative-vote-per-unit method set forth in the bylaws of Plaintiff/Counterclaim Defendant–Appellant Association of Apartment Owners of Maalaea Kai, Inc. (the Association), the order and the court's December 27, 2000 judgment and its May 2, 2001 amended final judgment are vacated, and this case is remanded for the court to enter an order (1) denying the Stillsons' motion for partial summary judgment and (2) granting the Association's cross-motion for summary judgment as to the 75% requirement. Also, consistent with such vacation of the November 29, 2000 order and because the court found the conversion surcharge levied on the Stillsons was inequitable without setting forth the grounds for its findings, the case is remanded to the court to decide whether the Association assessed the surcharge against the Stillsons in "a fair and equitable manner."

## I.

This is the second appeal in a case that began as a foreclosure action brought by the Association against the Stillsons. On September 25, 1996, the Association filed a complaint to foreclose on the Stillsons' Maalaea Kai condominium apartment for failure to pay a monthly conversion surcharge relating to the Association's purchase of the leased fee interest of the Maalaea Kai condominium project. On February 28, 2000, this court issued a memorandum opinion vacating the circuit court's judgment in favor of the Stillsons. *AOAO Maalaea Kai, Inc. v. Stillson,* No. 22310, 92 Hawai'i 628, 994 P.2d 560 (Feb. 28, 2000) (mem.) [hereinafter, "Memo op."]. The memorandum opinion set forth the following pertinent facts:

> On October 7, 1974, the Stillsons acquired fee simple title to apartment 209 at the Maalaea Kai condominium project (the "Project") and an appurtenant undivided 1.4306% interest in the Project's common elements. The Stillsons were granted a leasehold estate in the land appurtenant to their apartment. The leasehold estate, created by the lease, was one of seventy-nine such leasehold estates, representing

each of the Project's seventy-nine condominium apartments.

> . . . .

> . . . On December 28, 1994, the Association's bylaws were amended to allow the Association to purchase the leased fee interest "subject to the approval of the Apartment Owners . . . constituting 70%[2] of the common interest in the Project."

> On July 17, 1995, the Board [of Directors of the Association] sent a second letter to the apartment owners, noting that "the lessor has now taken the position that it is unwilling to consider an offer contingent upon 70% of the owners agreeing to purchase their share of the leased fee interest from the Association." *The Association issued a "written consent ballot" to the apartment owners, asking the owners to indicate whether they were "in favor of" or "against" an "[a]mendment of . . . the By-laws to allow the Association to make an offer to purchase the lessor's interest in the Project without requiring 70% of the owners to execute contracts for the purchase of their leased fee interest."* The Stillsons voted "against" the amendment. On August 11, 1995, the Association's bylaws were amended to remove the seventy percent participation requirement. On February 23, 1996, the Association acquired the leased fee interest.

> On January 31, 1996, the Stillsons were notified that their monthly payment of maintenance fees would increase due to "the Association's purchase of the fee." The increase included a $276.00 monthly "conversion surcharge," which was equal to the Stillson's proportionate 1.4306% interest in the Project's common elements. The Stillsons did not pay the conversion surcharge.

> . . . .

> On September 25, 1996, the Association filed a complaint against the Stillsons . . . [seeking] foreclosure on the Stillsons' apartment.

> . . . .

> On November 13, 1996, the Stillsons filed their answer and counterclaim. In

---

2. The basis for the 70% figure is unclear.

their counterclaim, the Stillsons alleged, in Count I, that the Association had violated HRS § 514C–6 ... by requiring them to pay fee conversion surcharges and to service the Association's fee conversion debt.

....

On July 31, 1997, the Stillsons filed a motion for summary judgment on Count I of their counterclaim.... On October 8, 1997, the circuit court entered an order denying the Stillson[s'] motion[.]

....

On December 1, 1997, the Stillsons filed a motion for summary judgment on Count III of their counterclaim. The Stillsons' central argument was that, inasmuch as "purchase of the fee interest altered the common element[s], the Association was required to obtain the consent of all condominium owners" prior to purchasing the interest, pursuant to HRS § 514A–13[.] ... On January 15, 1998, the circuit court entered an order granting the Stillsons' motion....

Memo op. at 3–7 (brackets in original, brackets added) (emphasis added).

In the first appeal, this court vacated "the circuit court's final amended judgment of January 14, 1999" and remanded the case "for a determination of whether the Association met the requirements of HRS § 514C–6(a)[,]" memo op. at 21, "and ... whether the fee conversion surcharge ... was assessed in a 'fair and equitable manner' pursuant to HRS § 514C–6(a)(3)," memo op. at 17 n. 10.

## II.

On remand, the Stillsons filed a motion on July 20, 2000, for partial summary judgment on the first of the two remanded issues. On September 18, 2000, the Association filed a cross-motion for summary judgment, praying for judgment "in its favor as to all remaining issues[,]" which apparently included a determination that the 75% approval requirement was met, or, alternatively, that the savings clauses in HRS §§ 514C–4 and 514C–6(b) upheld the purchase, and that the conversion surcharge was assessed in a "fair and equitable manner." On October 4, 2000, the court granted the Stillsons' motion for partial sum-

mary judgment, concluding that the Association did not satisfy the 75% approval requirement of HRS § 514C–6(a). On November 28, 2000, the court denied the Association's cross-motion for summary judgment. The court's November 29, 2000 findings of fact, conclusions of law, and order granting the Stillsons' motion for partial summary judgment stated, *inter alia,*

### FINDINGS OF FACT

....

4. Fewer than 75% of the unit lessees actually signed the 1995 Written Consent.

5. *The 1995 Written Consent was signed by unit lessees representing 66.9518% of the common interest.*

....

### CONCLUSIONS OF LAW

....

2. Section 514C–6(a) is unambiguous.

3. [Section 514C–6(a)] may be read as requiring the *affirmative vote of seventy-five percent (75%) of the condominium unit lessees, as weighted to reflect the percentage common interest appurtenant to each such unit,* without creating a result that is absurd or inconsistent with the purposes of the statute.

4. The Association failed to meet the 75% lessee approval requirement of Section 514–C(6)(a) in purchasing the leased fee interest.

5. *The Association's conveyance of the fee interest appurtenant to certain condominium units to their respective owners after acquiring the fee interest did not validate the original purchase by "ratification."*

6. The savings clauses found in H.R.S. §§ 514C–4 and 514C–6(b), to the extent either provision could be read as validating a purchase without 75% lessee approval, may not be read as allowing the Association to assess the costs of acquiring the leased fee interest. To read the "savings" clause

**6**

more broadly would vitiate the requirement of 75% lessee approval.

7. While the Legislature may have intended Act 241 to be retroactive, application of the "savings" clause to permit assessment of the Stillsons for a share of fee conversion costs, under the circumstances of this case, would violate the Contracts Clause of the United States Constitution.

(Emphases added.) At the hearing on the motion, the court apparently accepted the Stillsons' method for calculating the votes of multiple-owner units. According to the Stillsons' method, in an apartment with two owners and an appurtenant share of common interest (expressed in percentage as "PCI") of 1.4306, both owners had to vote in favor of the purchase for the entire 1.4306 interest to be attributed to the 75% requirement. If only one owner voted in favor of the purchase, only one-half of the 1.4306, or .7153 interest, was counted toward the 75% requirement. Employing this method of counting "votes," the court determined, as indicated above, that the 75% requirement had not been satisfied. The court granted the Stillsons' motion for partial summary judgment on Count I of the counterclaim, and entered judgment in favor of the Stillsons and against the Association. The court entered final judgment resolving all claims on December 27, 2000.

On January 8, 2001, the Stillsons filed a motion to amend the judgment and on January 9, 2001, they filed a motion for attorney's fees, costs, and expenses. On February 27, 2001, the court granted the Stillsons' motion to amend the findings, conclusions, and order. The order was amended to state:

3. That the Association be and the same is hereby permanently enjoined from collecting or attempting to collect from the Stillsons, or either of them, any fee, charge or assessment in connection with the Association's purchase of the fee interest, including without limi-

tation the billing of fee conversion expenses as an element of the common area maintenance expenses.

By order dated April 10, 2001, the court also awarded the Stillsons attorney's fees and court costs, and reimburseable expenses. The court entered an amended final judgment on May 2, 2001.

### III.

The Association appeals from the December 27, 2000 judgment and May 2, 2001 amended final judgment of the court. The Association raises fourteen points on appeal. Pertinent here, the Association argues that the court erred in (1) finding and concluding that "[t]he Association failed to meet the 75% lessee approval requirement of [HRS § 514C(6)(a) ] in purchasing the leased fee interest[ ]"[3]; (2) concluding that "[t]he Association's conveyance of the fee interest appurtenant to certain condominium units to their respective owners after acquiring the fee interest did not validate the original purchase by 'ratification' "[4]; (3) concluding that "[t]he savings clauses found in HRS §§ 514C–4 and 514C–6(b), to the extent either provision could be read as validating a purchase without 75% lease approval, may not be read as allowing the Association to assess the costs of acquiring the leased fee interest"[5]; and (4) ruling that "the [Association's] fee expense assessment was not assessed in a 'fair and equitable manner' pursuant to HRS § 514C–6(a)(3)."[6]

In response, the Stillsons argue that (1) the Association "failed to meet the seventy-five percent requirement of HRS § 514C–6(a) before purchasing the leased fee interest"; (2) "HRS § 514C–6(a) did not allow the [Association] to count the approval of one lessee of a given unit as the approval of the co-lessees of that unit"; and (3) "nothing in HRS §§ 514C–4 or 514C–6(b) (1993) 'saves' the power to assess if the fee purchase was

---

3. This argument represents the Association's first, second, and sixth points on appeal.

4. This is the Association's third point on appeal.

5. This argument represents the Association's fourth and fifth points on appeal.

6. This is the Association's seventh point on appeal.

not approved by 75% of the lessees as required by HRS § 514C–6(a)."

## IV.

▮ Summary judgment decisions are reviewed *de novo. Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *recon. denied,* 74 Haw. 650, 843 P.2d 144 (1992). "Unlike other appellate matters, in reviewing summary judgment decisions an appellate court steps into the shoes of the trial court and applies the same legal standard as the trial court applied." *Beamer v. Nishiki,* 66 Haw. 572, 577, 670 P.2d 1264, 1270 (1983) (citation omitted). Summary judgment will be upheld "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Heatherly v. Hilton Hawaiian Vill. Joint Venture,* 78 Hawai'i 351, 353, 893 P.2d 779, 781 (1995) (citations omitted).

## V.

In its first argument, the Association contends that HRS § 514C–6(a) is "silent both as to [the] method of calculating the [75%] vote, and the timing of the required 'approval.'" It argues that the court erred by applying a "fractionalized method for calculating the vote" and that the court should have instead employed the "one unit, one vote" method required in the Association's bylaws.

At the hearing on the Stillsons' motion for partial summary judgment, the court was "convinced" that "under the plain reading of the statute, the [Stillsons'] view . . . that it must be 75 percent of the lessees, 75[sic] who hold 75 percent of the common interest [a]ppurtenant is the common view." In conclusion of law no. 3 of the November 29, 2000 findings of fact, conclusions of law, and order granting the Stillsons' motion, the court decided that HRS § 514C–6(a) "may be read as requiring the affirmative vote of seventy-five percent (75%) of the condominium unit les-

sees, as weighted to reflect the percentage common interest appurtenant to each such unit[.]"

## VI.

### A.

▮ We note, initially, that the court's interpretation of HRS § 514C–6(a), which we construe as requiring approval by lessees owning units to which at least 75% of the common interests are appurtenant, was correct. HRS § 514C–6(a) (1993) states, in relevant part, as follows:

(a) The association of apartment owners or cooperative housing corporation may purchase the leased fee interest in the land; *provided that at least seventy-five per cent of the condominium unit lessees* or cooperative unit lessees *approve of the purchase.* . . . As used herein, *seventy-five per cent of the condominium unit lessees means the lessees of units to which seventy-five per cent of the common interests are appurtenant*[.]

(Emphases added.)

▮ When construing a statute, "the fundamental starting point is the language of the statute itself . . . [and] where the statutory language is plain and unambiguous, [the appellate courts'] sole duty is to give effect to its plain and obvious meaning." *State v. Kalama,* 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000). A plain reading of HRS § 514C–6(a) does not indicate that 75% of the lessees or 75% of the units must approve of the purchase.[7] Rather, the touchstone is "seventy-five per cent of the common interests . . . appurtenant" to the units. Hence, approval under HRS § 514C–6(a) is effective so long as the lessees of units to which that percentage of common interests is appurtenant approve of the purchase.

The legislature provided an express definition for the entire phrase, "seventy-five per cent of the condominium unit lessees." In construing HRS § 514C–6(a), then, the phrase should be evaluated and applied as a

---

**7.** Neither party appears to object to the court's weighing adjustment to reflect the common in-

terest appurtenant to each such unit.

whole so as not to render the definition superfluous or insignificant. *See In re City & County of Honolulu Corp. Counsel*, 54 Haw. 356, 373, 507 P.2d 169, 178 (1973) (applying the "cardinal rule of statutory construction that a statute ought upon the whole be so construed that, if it can be prevented, no clause, *sentence* or word shall be superfluous, void, or insignificant") (emphasis added). According to the language of the statute, the subject phrase means "the lessees of units to which seventy-five per cent of the common interests are appurtenant." Thus, by reading the definition into the phrase, the statute reads that "[t]he association of apartment owners ... may purchase the leased fee interest in the land; provided that [*the lessees of units to which seventy-five per cent of the common interests are appurtenant*] approve of the purchase." [8]

We were faced with a similar situation in *Coon v. City & County of Honolulu*, 98 Hawai'i 233, 47 P.3d 348 (2002). There, this court refused to apply an *external* definition of "condominium owners" in construing Honolulu's lease-to-fee conversion law, Revised Ordinances of Honolulu (ROH) chapter 38. *Id.* at 248, 47 P.3d at 363. ROH § 38–2.2 required, *inter alia*, that "[a]t least 25 of all the condominium owners within the development or *at least owners of 50 percent of the condominium units*, whichever number is less, apply to the [City's] Department [of Housing and Community Development (Department)] to purchase the leased fee interest." *Id.* at 238 n. 3, 47 P.3d at 353 n. 3 (emphasis added). The Department's rules § 2–3, however, conflicted with ROH § 38–2.2 in that it required only "25 condominium owners by number, or 50% of the *condominium owners* of a development, whichever shall be the lesser number," *id.* at 246, 47 P.3d at 361 (emphasis in original), "impermissibly re-

duc[ing] the number of applicants required to trigger ROH ch. 38 proceedings below that prescribed by ROH 38–2.2(a)(1)[,]" *id.* at 247, 47 P.3d at 362. This court adhered to the plain reading of the ordinance and construed "50 percent of the condominium units" to mean "fifty percent of all the units in the condominium development" as opposed to "50 percent of the condominium owners" or "50 percent of the owner-occupied condominium units." *Id.* at 248, 47 P.3d at 363.

B.

It would appear evident that if the legislature desired that every lessee holding an interest in a single apartment vote in the affirmative before the PCI in the apartment would be attributed to the 75% threshold, it could have easily required the "unanimous" consent of all owners of a condominium. The legislature, however, designated only the ultimate condition in HRS § 514C–6(a), the requirement of an affirmative vote from 75% of the common interests appurtenant to the units, and not 75% of the common interests appurtenant to the units in which every individual lessee votes in the affirmative.

■ The statute is clear, then, that an affirmative vote of 75% of the common interest is required, but does not limit the method for calculating the threshold percentage. In that regard, HRS § 514A–81 (1993) provides that "[t]he operation of the property shall be governed by bylaws, a true copy of which shall be recorded in the same manner as the declaration." The Stillsons argue that "voting rights of owner/lessees with respect to the acquisition of the fee interest[ is] not '*operation* of the property.'" (Emphasis in original.)

However, HRS § 514A–3 (1993) provides that " '[o]peration of the property' means and

8. The dissent interprets the statute by isolating the subject phrase into individual parts, employing separate definitions of "common interests" and "condominium unit lessees" from outside of § 514C–6. *See* Dissenting opinion at 28, 116 P.3d at 670. It uses the definitions of "common interests" from HRS § 514A–3 and "condominium unit lessees" from § 514C–1. By this process, it arrives at the conclusion that "the units in which all of its *lessees* voted in the affirmative, as weighted to reflect each unit's percentage of common interest, must collectively amount to seventy-five percent." Dissenting opinion at 29, 116 P.3d at 671 (emphasis added). This approach, however, is a piecemeal reconstruction of HRS § 514C–6 and, with all due respect, seemingly disregards the legislature's express definition. Thus, the dissent's importing of definitions *from outside the governing statute*, HRS § 514C–6, would not produce a correct result.

includes the *administration,* fiscal management, and operation of the property and the maintenance, repair, and replacement of, and the making of any additions and improvements to, the common elements." (Emphasis added.) Based upon this definition, the term "operation of the property" is broad in scope inasmuch as it "includ[es]" and thus is not limited to the objects enumerated in HRS § 514A–3. The term "operation" itself is defined as "[e]xertion of power; the process of operating or mode of action; an effect brought about in accordance with a definite plan; action; activity." *Black's Law Dictionary* 1092 (6th ed.1990). Hence, the bylaws may pertain to any "action" or "activity" with respect to the property.

It would also appear that voting on the leased fee purchase is implicated in the "administration" of the property. "Administration" is defined as "the principles, *practices, and rationalized techniques employed in achieving the objectives or aims of an organization* [,] ... administrative management[,] the *phase of business management that plans, organizes, and controls the activities* of an organization for the accomplishment of its objectives in the long run often *as distinguished from operative management.*" *Webster's Third New Int'l Dictionary* 28 (1961) (emphases added). Applying this definition, voting procedures would constitute "practices" and "rationalized techniques" that associations "employ[ ] in achieving the objectives or aims of an organization," in this case, the purchase of the leased fee.[9] Thus, contrary to the dissent's assertions, the bylaws govern more than mere "daily operations of the condominium property." Dissenting Opinion at 26, 116 P.3d at 668.

Indeed, bylaws generally establish the rules governing the condominium. *See Raines v. Palm Beach Leisureville Cmty. Ass'n,* 413 So.2d 30, 32 (Fla.1982) ("[A] condominium association derives its powers, duties, and responsibilities from [Florida Statutes] chapter 718 and from the association's declaration of restrictions and by-laws."); *Bradford Square Condo. Ass'n v.*

*Miller,* 258 Ga.App. 240, 573 S.E.2d 405, 409 (2002) ("The condominium instruments, including the bylaws and the sales agreement, are a contract that governs the legal rights between the [a]ssociation and unit owners."); *Chapman Place Ass'n, Inc. v. Prokasky,* 507 N.W.2d 858, 863 (Minn.Ct.App.1993) ("[T]he condominium act, in conjunction with the [d]eclaration and the [a]ssociation's by-laws, governs the rights of the [a]ssociation and condominium unit owners."); *Lion Square Phase II & III Condo. Ass'n v. Hask,* 700 P.2d 932, 934 (Colo.Ct.App.1985) ("A condominium association may exercise its powers only within the constraints of its condominium declaration and bylaws.").

That associations may implement various voting methods through their bylaws does not alter the application of HRS § 514C–6(a). The voting *method* may vary across associations, but the *application* of HRS § 514C–6(a) does not change. Associations must still obtain the requisite 75% approval for a purchase to be valid and as to that mandate, each association's bylaws is subject to examination for compliance with the statute in the event of a dispute. Hence, any fear to the contrary would be unmerited.

### VII.

#### A.

■ Therefore, in this case, the Association's bylaws, which govern the condominium property pursuant to HRS § 514A–81, and are not otherwise violative of the law, control on the question of how the votes are to be calculated. The bylaws indicate that a designated person chosen by the owners "shall" vote on behalf of all owners of a unit. The bylaws state in part as follows:

> 2. *Voting Owners.* There shall be one "Voting Owner" of each apartment. The voting owner who need not be an owner *shall be designated by the owner or owners of each apartment by written notice* delivered to the Board of Directors.... In the absence of any such designation, the owner or owners of an apartment shall be deemed

---

9. The dissent asserts that voting on the fee purchase "does not fall within ... 'administration[,]'" dissenting opinion at 26, 116 P.3d at

668, without discussion of the definitions of "operation" or "administration."

to be the voting owners of such apartment, and, if any apartment be owned by more than one owner (and *whether such owner shall hold such apartment jointly, commonly, or by the entireties), any one of such owners present in person at any meeting of the Association shall be deemed to be the voting owner of such apartment,* and if there be more than one of such owners present at any meeting, and if there be any dispute among them as to which of them shall be deemed to be the voting owner of such apartment, *then the majority of them then present shall select a voting owner.*

(Emphasis in original and emphases added.) [10] The bylaws, then, do not provide for fractional votes to be cast by the separate owners of a multi-owner unit as the court determined. Each unit, even if having more than one owner, is entitled to, and can cast, but one vote. The court's method of calculating the "approval" contravened the bylaws, which do not contemplate fractionalization of a "vote," but, rather, mandate one vote per apartment.

The "voting owner" provision in the bylaws is consistent with the Condominium Property Act, chapter 514A.[11] HRS § 514A–11(6) (1993) mandates that condominium association declarations "shall express ... [t]he percentage of undivided interest in the common

elements[12] appertaining to each apartment *and its owner for all purposes, including voting*[.]" Thus, the Association's bylaws,[13] requiring multi-owner apartments to designate a representative "voting owner" for purposes of casting a vote, comports with HRS § 514A–11(6), which mandates an "owner" for the purpose of "voting" be identified in the declaration.[14]

Moreover, the Association's voting procedure effectuates legislative intent. In the first appeal, this court looked to the subsequent 1999 amendments to HRS chapter 514C and accompanying legislative history "to confirm its interpretation" of § 514C–6(a).[15] *See* Memo op. at 14–15. It was noted that, "in 1999, the legislature expressly stated that it was *'clarifying'* its original intent regarding the powers of association of apartment owners involved in lease-to-fee conversions in the case of voluntary conversions by associations of apartment owners." *Id.* (emphasis in original). The preamble section of the 1999 amendment to chapter 514C, Act 241, provided that

"[t]he legislature further finds that it is necessary to clarify the powers of the boards of directors of associations of apartment owners to enter into purchase agreements with lessors to *facilitate and encourage* voluntary lease to fee conversions

10. The dissent maintains that the bylaws are "tangential" because the Association's "bylaws dictate the 'one vote per unit' voting method expressly in terms of voting at board meetings— not for fee purchases[.]" Dissenting opinion at 26–27, 116 P.3d at 668–69. However, the "Voting Owners" provision plainly applies to voting in general and does not expressly limit its applicability to "board meetings." Indeed, as noted, there was no challenge to the use of ballots for voting purposes. *See infra* note 18.

11. The Condominium Property Act, HRS chapter 514A, was formerly known as the Horizontal Property Act, HRS chapter 514. 1988 Haw. Sess. L. Act 65, §§ 1–2 at 98. The Association's declaration and bylaws were recorded simultaneously on April 9, 1974 pursuant to the Horizontal Property Act, HRS chapter 514.

12. The definition of "common elements" encompasses "[t]he land included in the condominium property regime, whether leased or in fee simple[.]" HRS § 514A–3(1) (1993).

13. The bylaws are recorded in the same manner as the declaration. *See Ass'n of Owners of Kukui Plaza v. City & County of Honolulu,* 7 Haw.App. 60, 66 n. 6, 742 P.2d 974, 978 n. 6 (1987) (citing HRS § 514A–81).

14. The requirement under HRS § 514A–11(6) that declarations designate the "owner" of each apartment for the "purposes" of "voting" applies to the Association's declaration even though the declaration pre-dates the statute. The bylaws state that the horizontal property regime was "established under and pursuant to Haw.Rev. Stat., Chapter 514" and that if "the *said statute be amended or reenacted, any such amendment or reenactment shall govern and regulate this horizontal property regime, without amendment* to or of the" declaration and bylaws. (Emphasis added.)

15. The subsequent legislative history supported the court's view "that the legislature did not intend HRS § 514C–6 to apply *solely* to cases regarding the right of first refusal." Memo op. at 15 (emphasis in original).

of condominium projects in an *efficient and economical manner."*

1999 Haw. Sess. L. Act 241, § 1 at 743 (emphases added). The Association's apparent justification for the designation of a representative voting owner is in consonance with the legislature's intent to "facilitate and encourage" lease-to-fee conversions in an "efficient and economical manner" as explained below.

### B.

For under chapter 514A, "[a]ny apartment may be jointly or commonly owned by more than one person." HRS § 514A-5 (1993). A "person" is defined as "an individual, firm, corporation, partnership, association, trust, or other legal entity, or any combination thereof." HRS § 514A-3. Thus, the legislature plainly contemplated that (1) an apartment could be owned in various estates, including joint tenancy, tenancy in common, and tenancy by the entirety, and (2) legal entities—firms, corporations, partnerships, associations, trusts, or otherwise—and *combinations* of legal entities could own a single apartment.

Under this framework, condominium property regimes produce complex forms of ownership involving a multitude of "persons." Indeed, the Association apparently adopted the designated "voting owner" requirement to address the perceived difficulty with respect to voting by multiple-owner apartments, inasmuch as the voting provision in the Association's bylaws references apartments held "jointly, commonly or by the entireties[.]" Hence, the representative "voting owner" procedure dictated by the Association's bylaws efficiently and economically addresses the complexities that arise in multiple-owner apartments. In other words, the Association's voting procedure effectuates the legislature's aim of efficient and economical lease-to-fee conversions and could hardly be more rational and consistent with the statute. In light of the legislature's recognition of various ownership statuses, the "rational, sensible and practicable interpretation" of the statutes, *Southern Foods Group L.P. v. Dep't of Educ.*, 89 Hawai'i 443, 453–54, 974 P.2d 1033, 1043–44 (1999), authorizes

the Association's designated owner voting procedure.

### C.

Assuming, *arguendo,* some ambiguity in HRS § 514C-6(a), construing the statute to require the affirmative vote of *every joint or common owner or every individual comprising a legal entity* would defeat the legislature's objective of facilitating and encouraging lease-to-fee conversions in an efficient and economical manner. This court has rejected an analogous argument in interpreting Honolulu's lease-to-fee conversion law.

In *Coon,* this court was faced with an "internally inconsistent" ordinance that "restrict[ed] the definition of a 'lessee' to an 'owner-occupant' who must be 'an *individual,*' while at the same time extending 'lessee' status to trusts and other legal entities." 98 Hawai'i at 259, 47 P.3d at 374 (emphasis added). The appellants in that case argued that, "where a condominium leasehold is held in trust, the *only* lessees qualified to purchase the fee interest pursuant to [the ordinance]" are, *inter alia,* "*trustees* (because only trustees hold legal title to property)" and "*natural persons*[.]" *Id.* at 258, 47 P.3d at 373 (emphasis in original and emphases added).

This court rejected the appellants' interpretation and held that "the benefits of ROH ch. 38 extend[ed] to owner-occupants of condominiums who have elected to structure the title to their assets in a trust, subject to the proviso that it is the trustee who is eligible to purchase the leased fee interest." *Id.* at 260, 47 P.3d at 375. It was reasoned that

> allowing the occupants of condominiums, who qualify to purchase their leased fee interests pursuant to [the ordinance] in all respects except that legal title to the condominium unit is technically held in trust for their benefit, to convert their leased fee interests in their condominium unit into fee simple interests *furthers the ordinance's goal of protecting those condominium owners most at risk.*

*Id.* Consequently, in *Coon,* this court adopted the interpretation that furthered the goal of ROH chapter 38, rejecting a literal interpre-

tation of the ordinance that would contravene legislative intent.

Insofar as HRS § 514C–6(a) could be viewed as ambiguous, implementing the Association's bylaws, as opposed to requiring unanimous approval by each owner in multi-owned apartments, would be preferable because, as in *Coon*, this "furthers" the legislature's "goal" of "facilitating" conversions in an "efficient" manner. To do otherwise would be inconsistent with established statutory construction principles and the approach taken in *Coon*.[16]

## VIII.

It must be further noted that the Association's bylaws do not prohibit a unanimous vote as to "persons" owning a condominium as the dissent implies, dissenting opinion at 26–28, 116 P.3d at 668–70, but only require the owners to designate a person to cast a vote on behalf of the apartment. Prescribing that "if a unit is owned by three lessees and one lessee votes against the fee purchase, that unit's percentage of common interest, in its entirety, will not count towards the requisite seventy-five percent, notwithstanding the affirmative votes of the other two lessees[,]" dissenting opinion at 29, 116 P.3d at 671, would exceed the statutory boundaries of HRS § 514C–6(a). For on its face the statute focuses not upon how the vote of the several lessees (in the event there is more than one) are to be counted. Rather, HRS § 514C–6(a) expressly defines and states that "seventy five per cent of the condominium lessees *means* the lessees of *units* to which seventy five per cent of the common interests are appurtenant" (emphases added), thus making the condominium apartment itself and not the several "lessees" the voting unit to be counted.

Additionally, a unanimity mandate would run counter to the direction of legislative intent as described above and as subsequent-ly indicated by HRS § 514C–22. The legislature now permits associations an alternative route to purchasing the fee interest by allowing the board of directors to do so without obtaining the 75% approval vote. *See* HRS § 514C–22 (Supp.2004) (authorizing associations to "purchase the lessor's interest in the condominium project provided[ ] that the declaration of condominium property regime shall either contain or be amended to include a provision authorizing the board of directors to effectuate such a purchase").

Nevertheless, if we were to adopt the dissent's position, associations which prefer that a vote of the owners be had would otherwise be constrained in their method of voting and only an amendment to the statute by the legislature would obviate the requirement of having every individual and entity comprising an owner cast an affirmative vote. In the absence of any apparent conflict with HRS § 514C–6(a), the dissent's approach would also unduly interfere with any arrangements multiple owners may choose to make or have made among themselves as to voting with respect to a fee purchase. Additional cost and expense for owners would be incurred if, for example, devices such as powers of attorney were needed to be employed, assuming that the use of such devices would be permissible under the dissent's approach. For the foregoing considerations, the representative voting owner by-law should be confirmed as consistent with the requirements of HRS § 514C–6(a).

## IX.

Although the Association is correct that the court erred in applying a fractional vote count, the Association's own calculation may not have complied with the procedural requirements of its bylaws. To determine if the 75% requirement was satisfied, the court tabulated the 1995 written consents to amend the bylaws.[17] By employing the Stillsons' fractional vote method, the court found, as

---

16. The dissent's position effectively places the association members in this case in a position like that rejected by this court in *Coon*.

17. The amendment proposal would "allow the Association to make an offer to purchase the lessor's interest in the Project without requiring 70% of the owners to execute contracts for the

purchase of their leased fee interest." (It is unclear why the 70% figure was used.) In addition to the 1995 consents, the Association points to "four separate occasions" in which it obtained the requisite 75% approval: (1) 1994 ballots seeking approval for acquisition of the leased fee interest; (2) 1995 written consents; (3) 1995

stated *supra,* that the 1995 consents were "signed by unit lessees representing 66.9518% of the common interest[,]" falling short of the requisite 75%. The Association, on the other hand, by employing the "one unit, one vote" method, arrived at a 75.7836% approval rate.

According to section 2 of the bylaws, quoted above, in multiple-owner apartments, a vote is valid if the co-owners designate a representative "voting owner" by providing the Board of Directors with written notice.[18] In tabulating the 1995 consents, the Association "accept[ed] the signature of a single co-owner as exercising the vote of all co-owners unless one or more of the co-owners dispute[d the] right to vote." [19]

At his deposition, Richard Ekimoto (Ekimoto),[20] the attorney who represented the Association in acquiring the leased fee interest, testified that "if there was one co-owner who signed the written consent form, we counted that as the vote of the owner—for that apartment unless we got a conflicting statement or an objection. And it was based on industry practice and the by-law provision." Based on Ekimoto's testimony, the Association did not confirm that the owner who signed the consent was the designated "voting owner" before applying the apartment's PCI to the 75% threshold.[21] The validity of the procedure followed, however, is not dispositive inasmuch as the subsequent deeds ratified the consents.

## X.

### A.

This jurisdiction has long recognized the doctrine of ratification. *See Gold v. Harri-*

son, 88 Hawai'i 94, 105–06, 962 P.2d 353, 364 (1998) (concluding that an attorney who did not sign a complaint was nevertheless subject to Hawai'i Rules of Civil Procedure Rule 11 sanctions because he "ratified and adopted the complaint ... as his own" by asserting "that everything in the case was done with his full knowledge and approval"); *Sharples v. State,* 71 Haw. 404, 407, 793 P.2d 175, 177 (1990) (acknowledging the rule that an "employer's liability under a ratification theory requires that the act complained of be done on behalf of or under the authority of the employer, and there must be clear evidence of the employer's approval of the wrongful conduct" (citation omitted)); *Maui Fin. Co. v. Han,* 34 Haw. 226, 230–31 (1937) (recognizing the "principle of the law of agency that an affirmance of an unauthorized transaction may be inferred from a failure to repudiate it" and therefore holding that the defendant ratified his wife's signature on his behalf by not objecting to it) (internal quotation marks and citation omitted); *Cook v. Surety Life Ins. Co.,* 79 Hawai'i 403, 411, 903 P.2d 708, 716 (App.1995) ("Any failure on the part of the client to object to an unauthorized act [by counsel in settlement negotiations] within a reasonable time after becoming aware of it will be construed as a ratification of it.").

In *Maui Finance,* this court adopted the Restatement of the Law of Agency's definitions for "ratification" and "affirmance." Accordingly, in Hawai'i, "ratification" is defined as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on

leased fee interest sales contracts to the apartment owners; and (4) limited warranty deeds to the purchasing owners. The court, however, found "that the 1995 ballot is the act in issue that requires the 75 percent vote, which is required by [HRS § ] 514C–6(a), which it refers to in the remand from the Supreme Court in this case" and did not consider the other forms of approval.

18. The Stillsons "do not challenge the [Association's] use of ballots in attempting to attain the 75% lessee approval threshold" rather than a vote at a meeting.

19. Richard Ekimoto, the attorney for the Association, made this statement in a July 25, 1995

faxed memorandum to Ray Simon, co-owner of unit 418.

20. Ekimoto withdrew as counsel on January 16, 1997, so that he could serve as a witness.

21. Ekimoto admitted to this method in the following exchange during his deposition:

Q. And so in your mind, all that was necessary was to count the number of consents that you had received, add up the PCI represented by those consents to determine whether or not the 75 percent threshold was met?

A. Yes.

his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." 34 Haw. at 230 (quoting Restatement of the Law of Agency § 82). "Affirmance" is defined as "a manifestation of an election by the one on whose account an unauthorized act has been performed to treat the act as authorized, or conduct by him justifiable only if there is such an election." *Id.* (quoting Restatement of the Law of Agency § 83).

## B.

 Eventually, 84.9669% of the owners, based on their weighted percentage ownership of the common elements, approved of the purchase by executing limited warranty deeds. In the warranty deeds, the Association, as "Grantor," conveyed legal ownership of the property upon which the condominium is located to the apartment owners or "Grantees." Section 8 of the deeds provided:

> Upon release of any and all such mortgages, liens or encumbrances, and provided that the owners of Grantee's Leasehold Interest and the Property are identical, it is the *intent* of the parties to this Deed that *there be a merger of Grantee's Leasehold Interest into the Property.*

(Emphases added.) Seventy out of seventy-nine apartments have purchased the fee interest in the property. *All title holders in each of the seventy units signed their respective deeds.* By signing the deeds, any purportedly non-consenting owners "manifest[ed]" an "election" to "treat the act [of the signing owner] as authorized," thereby constituting affirmance of the 1995 consents. This affirmance, in turn, gave "effect [to any questionable consents] as if originally authorized" by the purportedly non-consenting owner and resulted in ratification. Hence, even if the consents may have been marred by procedural error—*i.e.,* authorized by non-"voting owners"—more than 75% of the owners, as weighted by the common interests, eventually affirmed the 1995 consents.

## XI.

Thus, contrary to the dissent's contention that the "[e]xecution of these deeds alone does not contemplate that the condominium unit lessees who previously voted against the fee purchase *intended* to thereafter ratify the 1995 written consents and ultimately approve the fee purchase[,]" dissenting opinion at 30, 116 P.3d at 672 (emphasis in original), *the deeds themselves expressly state that it was the "intent" of the lessees to concur in, and, thus, to ratify the purchase of the fee.* The evidence in the record thus clearly and plainly manifests the lessees' assent to treat any negative votes as affirmative, inasmuch as the deeds are a plain manifestation of the *fact* that the lessees authorized and, thus, ratified the fee purchase.

The dissent "do[es] not believe execution of the ... deeds constituted 'ratification' so as to affirm the 1995 written consents and approve the fee purchase," dissenting opinion at 31 n. 15, 116 P.3d at 673 n. 15, because "[t]o do otherwise would circumvent the fee purchase process statutorily required" in "contraven[tion of] HRS § 514C–6(a) and the principles of ratification[,]" dissenting opinion at 30, 116 P.3d at 672. But no one contends that the Association in this case sought to "circumvent" the process. All title holders in seventy out of seventy-nine apartments have signed their deeds, even when they had the option .of not doing so. Their acceptance of the fee interest cannot demonstrate anything other than approval of the original fee purchase.

Signing the deeds manifests consent to the purchase. Rather than a "contraven[tion]" of "the principles of ratification," dissenting opinion at 31, 116 P.3d at 673, the execution of the deeds is the "sine qua non" of the act of ratification. These acts of ratification—an overwhelming acceptance of the deeds at 84.9669% weighted approval—plainly meet the statutory threshold. To reiterate, seventy out of seventy-nine units have purchased their respective fee interests. Accordingly, the Association satisfied the statutory requirement. To ignore the ratification and nullify the ratified transactions will have an unwarranted chaotic effect on the Association and its members. *See infra* Part XIII.

## XII.

 The doctrine of ratification also resolves the dispute regarding whether the As-

sociation was required to obtain 75% approval before the purchase.[22] To reiterate, HRS § 514C–6(a) permits the Association to purchase the fee interest "provided that at least seventy-five per cent of the condominium unit lessees ... approve of the purchase." The Stillsons contend that "the plain import of [HRS § 514C–6(a)] is that the approval must *precede* the purchase." (Emphasis in original.) However, "when ratified, *the prior unauthorized act has the same legal effect* and results in the same contractual relations between the principal and the person with whom the agent has dealt *as though the act of the agent originally had the prior authorization of the principal.*" *Maui Fin.*, 34 Haw. at 230 (emphases added). Ratification has the effect of validating any original allegedly unauthorized act. Inasmuch as any purportedly unauthorized consents was later ratified, the "prior unauthorized" consents had "the same legal effect" as if the signing owner "originally had the prior authorization" of his or her co-owners and/or the official "voting owner." Thus, the required 75% approval secured by the deeds dated back to the 1995 consents. No timing conflict results because the 1995 consents occurred before the purchase.

Therefore, the court erred in granting the Stillsons' motion for partial summary judgment and in denying the Association's cross-motion for summary judgment insofar as the Association met the 75% requirement as a matter of law. Accordingly, the court should have granted the Association's cross-motion for summary judgment as to the first remanded issue.[23]

### XIII.

The court's findings, conclusions, and order granting the Stillsons' motion, as well as its amended findings, conclusions, and order, did not address the second remand issue of whether the conversion surcharge was assessed in a "fair and equitable manner" pursuant to HRS 514C–6(a)(3). In their reply

brief, the Association maintains that "[t]he Stillsons all but concede that public policy weighs ... in favor of allowing the fee conversion to take place[ ]" because "*[t]he consequences would be staggering: the apartment owners who purchased the fee interests from the AOAO would have to return the fee interests and somehow reverse the mortgages taken out to effectuate the purchases. At the least, there would be a cloud upon the titles of all owners.*" (Emphasis added.) Because "[t]he Stillsons' argument would effectively void the purchase by 70 of the 79 apartments at the ... condominium[,]" the Association maintains that "the Stillsons attempt to ... [focus on] a much more limited question: ... 'simply whether ... the AOAO possesses the power to assess the Stillsons[.]' "

At the October 4, 2000 hearing on the Stillsons' motion, the court stated that "the conver[sion] surcharge was not fairly and equitably imposed[,]" but the basis for its decision remains unclear. The court seems to have rested its decision on its determination that the Stillsons should not be subjected to the surcharge in any case. This question, however, as stated above, was decided in the first appeal. As indicated in HRS § 514C–6(a)(3), the Association may subject the Stillsons to the surcharge. Inasmuch as the court did not provide a discernible basis for its holding other than that the surcharge is inapplicable to the Stillsons, this case is remanded on the discrete question of whether the surcharge was "assessed in a fair and equitable manner."

### XIV.

The Association argues that the court erred by denying its motion for repayment of the judgment awarded to the Stillsons following the memorandum opinion, which vacated the judgment. In its motion for repayment of judgment, the Association relied on HRS

---

**22.** As noted previously, the Association contended that HRS § 514C–6(a) was "silent ... as to ... the timing of the required 'approval.' ".

**23.** In light of the foregoing analysis, it is not necessary to reach the question raised by the

Association of whether HRS § 514C–4 or HRS § 514C–6(b) "saves" the fee purchase in a situation where the association has purchased the fee "without capacity or power to do" so. HRS § 514C–6(b).

§ 636–16,[24] relating to prejudgment interest, but did not provide any relevant authority on the issue of whether the Stillsons were required to repay the judgment. The Stillsons, on the other hand, argued that the court, "sitting in equity[,]" had the "sound discretion" to maintain the status quo pending decision on the merits and reminded the court that the Association originally failed to "avail itself of the opportunity to post a supersedeas bond within the period of time allowed" to stay enforcement of the judgment.

Inasmuch as we have held that the Association's cross-motion for summary judgment must be granted insofar as it pertained to the required 75% vote, the Stillsons are not entitled to any judgment amounts awarded them as a result of the court's contrary ruling. The Association requested "repayment of the garnished amounts ... plus prejudgment interest." On appeal the Association does not challenge the court's denial of prejudgement interest. Thus, we need not address the issue.

## XV.

Next, the Association contends that "[b]ecause the Stillsons undisputedly sought only partial summary judgment, and did not with 'particularity' seek specific relief, the [court] did not have the authority to award a complete summary judgment, or grant relief not specifically sought in the motion." (Emphases in original.) This argument need not be addressed inasmuch as we have already determined that summary judgment in favor of the Stillsons was inappropriate.

## XVI.

Finally, the Association argues that the court erred by awarding the Stillsons attorney's fees, costs, and expenses. Having de-

termined that the Stillsons did not prevail, the court's award of attorney's fees, costs, and expenses is vacated.

## XVII.

Based on the foregoing, (1) the December 27, 2000 judgment and May 2, 2001 amended final judgment are vacated and (2) this case is remanded (a) with instructions to the court to enter an order denying the Stillsons' motion for partial summary judgment and to enter an order partially granting the Association's cross-motion for summary judgment as to the 75% requirement and as to the Association's authority to render a surcharge and (b) for the court to determine whether the conversion surcharge was assessed against the Stillsons "in a fair and equitable manner."

Dissenting Opinion by NAKAYAMA, J., in which MOON, C.J., joins.

I disagree with the rationale employed by the majority to vacate the circuit court's order granting partial summary judgment in favor of Defendants/Counterclaimants–Appellees Thomas Hayden Stillson and Phyllis Payne–Stillson [hereinafter, collectively, "the Stillsons"] and against Plaintiff/Counterclaim Defendant–Appellant Association of Apartment Owners of Maalaea Kai, Inc. [hereinafter, "AOAO Maalaea Kai"], inasmuch as I do not believe that (1) voting on a leased fee purchase falls within the realm of "operation of the property" so as to be governed by AOAO Maalaea Kai's bylaws under Hawai'i Revised Statutes (HRS) § 514A–81 (1993),[1] and (2) executing a limited warranty deed conveying the fee interest already purchased by AOAO Maalaea Kai "ratifies" the purchase. Instead, contrary to the "one vote per unit" method proffered by the majority, I believe a logical reading of HRS § 514C–6(a)

---

**24.** HRS § 636–16 (1993) provides:

In awarding interest in civil cases, the judge is authorized to designate the commencement date to conform with the circumstances of each case, provided that the earliest commencement date in cases arising in tort, may be the date when the injury first occurred and in cases arising by breach of contract, it may be the date when the breach first occurred.

**1.** HRS § 514A–81 provides that "[t]he operation of the property shall be governed by bylaws, a true copy of which shall be recorded in the same manner as the declaration. No amendment to the bylaws is valid unless the amendment is duly recorded."

(1993) [2] delineates that the requisite 75% necessary to approve a fee conversion is calculated according to the units in which all of its lessees voted in the affirmative, as weighted to reflect each unit's percentage of common interest. As such, I must respectfully dissent.

# I. BACKGROUND

## A. General Background

In this second appeal, I reiterate only the basic background information relevant to my discussion on remand. On February 23, 1996, AOAO Maalaea Kai, through its board of directors, purchased the leased fee interest appurtenant to each condominium unit at the Maalaea Kai Condominium Project (Maalaea Kai Condominium) in Maui, Hawai'i.[3] Subsequent to the fee purchase, AOAO Maalaea Kai assessed the Stillsons a monthly "fee-conversion surcharge" proportionate to their 1.4306% interest in the Maalaea Kai Condominium's common elements.[4] The Stillsons, however, refused to pay the assessed surcharge.

2. HRS § 514C–6(a) provides, in relevant part, as follows:

> The association of apartment owners or cooperative housing corporation may purchase the leased fee interest in the land; provided that at least seventy-five per cent of the condominium unit lessees or cooperative unit lessees approve of the purchase. If the seller is also a condominium unit lessee or cooperative unit lessee, the seller's interest shall be disregarded in the computation to achieve the seventy-five per cent requirement. As used herein, seventy-five per cent of the condominium unit lessees means the lessees of units to which seventy-five per cent of the common interests are appurtenant and seventy-five per cent of the cooperative unit lessees means shareholders having at least seventy-five per cent of the shares in the cooperative housing corporation.

3. On December 28, 1994, AOAO Maalaea Kai amended its bylaws to allow it to purchase the leased fee interest in the Maalaea Kai Condominium "subject to the approval of the Apartment Owners ... constituting [seventy percent] of the common interest in the [Maalaea Kai Condominium]." However, on July 17, 1995, the board of directors notified the apartment owners that the lessor was unwilling to sell the fee "contingent upon [seventy percent] of the owners agreeing to purchase their share of the leased fee interest from [AOAO Maalaea Kai]." Thereafter, AOAO Maalaea Kai issued "written consent ballots" to

## B. Procedural Background

### 1. *Foreclosure Action*

On September 25, 1996, AOAO Maalaea Kai filed a complaint to foreclose on the Stillsons' Maalaea Kai Condominium unit for failure to pay the assessed "fee-conversion surcharge."[5] The Stillsons subsequently filed an answer and a six-count counterclaim against AOAO Maalaea Kai, alleging, *inter alia*, that AOAO Maalaea Kai (1) failed to obtain the necessary approval of at least seventy-five percent of the Maalaea Kai Condominium unit owners to purchase the leased fee interest, in violation of HRS § 514C–6(a), and improperly assessed them a "fee-conversion surcharge," in violation of HRS § 514C–6(c) [hereinafter, "Count I"], and (2) wrongfully purchased the leased fee interest, which altered the common elements, without obtaining the unanimous consent of the Maalaea Kai Condominium unit owners, in violation of HRS chapter 514A [hereinafter, "Count III"]. The parties, however, stipulated to dismiss the complaint without preju

the apartment owners, asking the owners to indicate whether they were "in favor of" or "against" amending the bylaws "to allow [AOAO Maalaea Kai] to make an offer to purchase the lessor's interest in the [Maalaea Kai Condominium] without requiring [seventy percent] of the owners to execute contracts for the purchase of their leased fee interest." The Stillsons voted against the amendment. On August 11, 1995, AOAO Maalaea Kai amended its bylaws, subsequently removing the seventy percent participation requirement for the fee purchase. Thus, on February 23, 1996, AOAO Maalaea Kai acquired the leased fee interest in the Maalaea Kai Condominium.

4. On October 7, 1974, the Stillsons acquired fee simple title to Apartment Number 209 at the Maalaea Kai Condominium and an appurtenant undivided 1.4306% interest in the Maalaea Kai Condominium's common elements. The Stillsons were also granted a leasehold estate in the land appurtenant to their apartment—one of seventy-nine leasehold estates representing each of the seventy-nine condominium units at the Maalaea Kai Condominium.

5. The complaint was also filed against Pioneer Federal Savings Bank (Pioneer Federal). All claims against Pioneer Federal, however, were dismissed without prejudice by stipulation on April 16, 1997.

dice after the Stillsons paid the assessed "fee-conversion surcharges" to avoid foreclosure.

### 2. *Summary Judgment Proceedings*

On July 31, 1997, the Stillsons filed a motion for summary judgment on Count I of their counterclaim, arguing that AOAO Maalaea Kai (1) failed to obtain consent from the requisite seventy-five percent of unit owners necessary to approve the fee conversion, as mandated by HRS § 514C–6(a), and (2) wrongfully assessed them a "fee-conversion surcharge" as a common expense, in violation of HRS § 514C–6(c). AOAO Maalaea Kai filed a memorandum in opposition to the Stillsons' motion for summary judgment, arguing that (1) the Stillsons' reliance on HRS chapter 514C was misplaced, inasmuch as "the acquisition of the fee interest by [AOAO Maalaea Kai] did not involve a right of first refusal[,]" and (2) a genuine issue of material fact existed as to whether AOAO Maalaea Kai obtained the required seventy-five percent approval to proceed with the fee acquisition. On October 8, 1997, the circuit court issued an order denying the Stillsons' motion for summary judgment on Count I of their counterclaim, holding that HRS chapter 514C "does not apply to the facts of the above-entitled action, because the subject sale of the leased fee interest in land under the Maalaea Kai [C]ondominium was not a result of [AOAO Maalaea Kai's] exercise of any right of first refusal pursuant to said Chapter 514C."

On December 1, 1997, the Stillsons filed a motion for summary judgment on Count III of their counterclaim, arguing that AOAO Maalaea Kai violated HRS §§ 514A–11 and 514A–13 "by compelling them to participate in [AOAO Maalaea Kai's] purchase of the leased fee interest" without securing the consent of all the condominium unit owners, inasmuch as the fee purchase altered the common elements. The Stillsons thus requested the following relief:

1. A declaratory judgment that AOAO Maalaea Kai's monthly assessment of a "fee conversion surcharge" [was] unlawful;

2. A money judgment equal to the monthly fee-conversion assessments paid by them of $4,772.80 through July 1, 1997, plus assessments through entry of a judgment in their favor; and

3. A permanent injunction barring AOAO Maalaea Kai from assessing the Stillsons any sum that includes any fee, charge or expense relating to its purchase of the lease fee interest.

AOAO Maalaea Kai filed a memorandum in opposition to the Stillsons' motion for summary judgment as to Count III, arguing that "there has been no 'alteration' of any common element by the [ ] purchase of any leased fee interest in the land[,]" and, therefore, AOAO Maalaea Kai was not required to obtain one hundred percent approval before purchasing the fee. On January 15, 1998, the circuit court entered an order granting the Stillsons' motion for summary judgment as to Count III of their counterclaim, ruling:

1. AOAO Maalaea Kai is declared to have violated [HRS] Chapter 514A ... in purchasing the leased fee interest in the land subject to the Horizontal Property Regime of the Maalaea Kai [C]ondominium [ ], as amended;

2. [The Stillsons] are granted judgment against [ ] AOAO Maalaea Kai in the sum of $4,772.80, plus the sum total of the fee conversion surcharges paid by them from July 1, 1997 through December 31, 1997;

3. [The Stillsons] are granted judgment against [ ] AOAO Maalaea Kai for such additional sums as may be established by affidavit as being a proximate result of the collection proceedings commenced by AOAO Maalaea Kai on account of [the Stillsons'] failure to pay the fee conversion surcharge adjudged unlawful by this order;

4. AOAO Maalaea Kai is permanently enjoined from assessing the Stillsons in the future any fee, charge or expense that relates to the purchase of the leased fee interest in the land subject to the Horizontal Property Regime of the Maalaea Kai [C]ondominium project, as amended.

5. Having prevailed on the Counterclaim, [the Stillsons] are entitled to costs and expenses, including attorneys' fees, to the extent allowed by law.

Subsequently, on February 3, 1998, the Stillsons filed a motion requesting $60,199.11 in attorneys' fees, costs, and expenses. The circuit court awarded the Stillsons $59,675.54 in attorneys' fees and costs, and $6,107.29 in additional expenses.

Thereafter, on December 21, 1998, the circuit court entered its findings of fact (FOFs) and conclusions of law (COLs).[6] Final judg-

6. The circuit court specifically entered the following FOFs and COLs:

*FINDINGS OF FACT*

1. By Apartment Deed dated October 7, 1974, [the Stillsons] acquired fee simple title to apartment 209 at the Maalaea Kai [C]ondominium [] and an appurtenant undivided 1.4306% interest in the [Maalaea Kai Condominium's] common elements.

2. By Apartment Lease of even date with the deed, the Stillsons were granted a leasehold estate in the land that was appurtenant to their apartment. The leasehold estate created by the lease was one of 79 such leasehold estates representing each of the [Maalaea Kai Condominium's] 79 condominium apartments.

3. The Stillsons' lease was for a term of 74 years and nine months, from December 1, 1974 to and including August 31, 2049.

4. For the ten (10) year period ending August 31, 2004, the Stillsons' lease requires payment of annual rent of $900.00.

5. After August 31, 2004, the annual rent payable under the lease is to be adjusted every fifteen (15) years to a sum equal to the fair market value of their proportionate leasehold interest in the land.

6. In September 1994, the Board of Directors of [AOAO Maalaea Kai] sought approval of an amendment to the bylaws to authorize purchase of the leased fee interest conditioned on [seventy percent] of the apartment owners agreeing to purchase their individual leased fee interests.

7. The proposed purchase of the leased fee interest in the land under the Maalaea Kai [C]ondominium was not a result of [AOAO Maalaea Kai's] exercise of any right of first refusal. Instead, [] AOAO [Maalaea Kai] sought to acquire the fee interest of its own initiative.

8. The Stillsons elected not to participate in the fee conversion.

9. On December 28, 1994, an amendment to the bylaws of [AOAO Maalaea Kai] was recorded.

10. On August 15, 1995, AOAO [Maalaea Kai] caused to be recorded in the Bureau of Conveyances a second amendment to the bylaws that, *inter alia*, removed the [seventy percent] participation requirement.

11. Under each of the amendments, costs relating to the purchase of the leased fee interest were deemed a common expense of [AOAO Maalaea Kai].

12. Neither amendment to the bylaws was obtained by the unanimous consent of the AOAO [Maalaea Kai] unit owners.

13. On January 31, 1996, the Stillsons were notified that their monthly assessment would increase due to [] "[AOAO Maalaea Kai's] pur-

chase of the fee." The increase included a $276.00 monthly "conversion surcharge" for 1996, equal to the Stillsons' proportionate 1.4306% interest in [AOAO Maalaea Kai's] common elements.

14. AOAO [Maalaea Kai] acquired the leased fee interest by instrument dated February 23, 1996.

15. AOAO [Maalaea Kai] thereafter revised its 1996 operating budget to reflect a monthly expense to service the "fee conversion debt."

16. On September 25, 1996, [] AOAO [Maalaea Kai] filed its complaint against the Stillsons, alleging that they had failed to pay their share of certain common expenses on their Maalaea Kai [C]ondominium apartment, which common expenses were chargeable to apartment owners "in proportion to the common interest appurtenant to their respective apartment[,]" pursuant to [HRS] Chapter 514A[.]

17. The Stillsons filed their answer and counterclaim on November 13, 1996.

18. To avoid foreclosure as a direct result of [] AOAO [Maalaea Kai's] actions, the Stillsons were compelled to pay:

| | | |
|---|---|---:|
| (a) | Fee Conversion Assessments | |
| | (through 7/1/97) | $ 4,722.80 |
| | (7/2/97–12/31/97) | $ 1,422.90 |
| (b) | Late Fees | $ 525.00 |
| (c) | Interest | $ 194.71 |
| (d) | Attorneys' Fees and Costs to AOAO Maalaea Kai Attorneys | $ 2,872.51 |
| (e) | Attorneys' Fees and Costs to Pioneer Federal's Attorneys | $ 1,092.17 |
| | **Total:** | **$10,880.09** |

*CONCLUSIONS OF LAW*

1. [HRS §] 514C–6(a) confers upon the association authority to "purchase the leased fee interest in the land" provided that at least seventy-five per cent [] of the condominium unit lessees approve of the purchase.

2. Under [HRS §] 514C–6(c), "[n]o condominium lessee shall be compelled to participate in the purchase of the leased fee interest of the property, but may instead pay lease rent to the association of owners."

3. Based on the title of [HRS] Chapter 514C[,] "Right of First Refusal for Condominiums and Cooperative Housing Corporations," and the purpose of the statutory scheme set forth in [HRS §] 514C–2, the [c]ourt concludes that the chapter is intended to apply only where the association has first exercised a right of first refusal.

4. Because no right of first refusal was exercised in this case, [HRS] Chapter 514C does not apply.

ment was entered on December 21, 1998, and an amended final judgment in favor of the Stillsons and against AOAO Maalaea Kai in the amount of $70,555.63 was entered on January 14, 1999.[7] AOAO Maalaea Kai timely appealed, and the Stillsons timely cross-appealed.

### 3. *AOAO v. Stillson, No. 22310, memo. op. (Haw. Feb. 29, 2000)*

On February 29, 2000, this court, by memorandum opinion, vacated the circuit court's January 14, 1999 amended judgment in favor of the Stillsons and remanded to the circuit court for a determination of (1) whether AOAO Maalaea Kai satisfied the requirements of HRS § 514C–6(a), and, (2) if so, whether the fee conversion surcharge was assessed in a fair and equitable manner. *AOAO v. Stillson,* No. 22310, memo. op. at 3, 17 n. 10, 92 Hawai'i 628, 994 P.2d 560 (Haw.

Feb. 29, 2000) [hereinafter, "memo. op."]. In reaching its decision, this court held that (1) HRS § 514C–6(a) applies whenever an association of apartment owners purchases a leased fee interest, memo. op. at 12–15; (2) the circuit court erred in applying the unanimity requirement of HRS § 514A–13(b), memo. op. at 16; (3) there was a genuine issue of material fact with regard to the percentage of owners who voted in favor of AOAO Maalaea Kai's fee purchase, memo. op. at 17; and (4) the mere assessment of a fee conversion surcharge does not trigger HRS § 514C–6(c), memo. op. at 19–20.

### 4. *Motion for Repayment of Vacated Judgment*

On June 23, 2000, AOAO Maalaea Kai filed a motion for order of immediate repayment of the vacated amended judgment in the amount of $72,778.00 [8] plus interest. Relying

---

5. The Stillsons rely alternatively on [HRS] Chapter 514A, entitled "Condominium Property Regimes." [HRS §] 514A–13(b) requires unanimous consent to any alteration of the common interest, defined as a percentage of the *undivided interest in the common elements.*

6. [ ] AOAO [Maalaea Kai's] purchase of the leased fee interest operated to alter the common element. *Penney v. Ass[ociation] of [Apartment] Owners of Hale Kaanapali,* 70 Haw. 469[, 470, 776 P.2d 393, 395] (1989). " 'An undivided interest in the common elements is an undivided interest in the whole and when that whole changes, that interest, if not the percent, also changes.' " *Id.* at 471, [776 P.2d at 395 (]quoting *Tower House Condo[.],* Inc. *v. Millman,* 410 So.2d 926, 930 (Fla.Dist.Ct.App., 3d Dist.1981)[) ].

7. To enlarge the common element to include the leased fee interest, [ ] AOAO [Maalaea Kai] was required to secure the consent of *all* affected apartment owners to an amendment to the declaration. *Id.* at 470–71[, 776 P.2d at 395]; *Ass[ociation] of Owners of Kukui Plaza v. City and County [of Honolulu],* 7 Haw. App. 60, 70[, 742 P.2d 974, 981] (1987).

8. Because [ ] AOAO [Maalaea Kai] did not obtain unanimous consent to amend the declaration in such a manner, it lacked the requisite authority to purchase the leased fee interest and could not assess a fee conversion surcharge as a common expense. *Cf. D'Elia v. Ass[ociation] of Apartment Owners of Fairway Manor,* 2 Haw.App. 347, 348[, 632 P.2d 296, 297] (1981); Rohan, 1A Condominium Law and Practice at 45.11[2] (2/97).

9. Accordingly, there is no genuine issue of material fact that [ ] AOAO [Maalaea Kai] vio-

lated [HRS] Chapter 514A by purchasing the leased fee interest in the land subject to the Horizontal Property Regime of the Maalaea Kai [C]ondominium [ ], as amended, and the Stillsons are therefore entitled to summary judgment on Count III of the Counterclaim.

10. AOAO [Maalaea Kai] is prohibited from assessing the Stillsons any fee, charge or expense that relates to the purchase of the leased fee interest in the land subject to said Horizontal Property Regime.

(Emphasis and some brackets in the original.)

7. The judgment was amended to set forth the following dispositions:

1. By stipulation filed April 16, 1997, all claims against the Stillsons and Pioneer Federal [ ] were dismissed without prejudice, disposing of all claims against all parties in the [c]omplaint;

2. Summary judgment was granted in favor of the Stillsons and against [ ] AOAO [Maalaea Kai] on Count III of the [c]ounterclaim by order filed herein on January 15, 1998;

3. On May 20, 1998, Counts II, IV, V and VI of the [c]ounterclaim were dismissed without prejudice by stipulation;

4. Summary judgment was granted in favor of [ ] AOAO [Maalaea Kai] and against the Stillsons on Count I of the [c]ounterclaim by order filed herein on October 7, 1998; and

By reason of the foregoing disposition of the parties' claims, there are no remaining parties or claims to be adjudicated herein[.]

8. On January 14, 1999, the circuit court entered an amended final judgment in favor of the Stillsons in the amount of $70,555.63. On March 31,

on HRS § 636–16 (1993),[9] AOAO Maalaea Kai argued that the circuit court should award them prejudgment interest at the rate of ten percent per annum, inasmuch as "the Stillsons have had the use of the garnished funds since April 2, 1999. The Hawaii Supreme Court has found that they were not entitled to such monies at this time. Accordingly such funds should be immediately returned."

On July 13, 2000, the Stillsons filed a memorandum in opposition to AOAO Maalaea Kai's motion for order of repayment, contending that AOAO Maalaea Kai's motion was premature and unfounded. The Stillsons argued that, because this court remanded for a determination of whether AOAO Maalaea Kai obtained the necessary seventy-five percent approval for the fee conversion, that issue "is ripe for summary adjudication, [and] it would be premature to burden the Stillsons with the obligation to repay the subject attorneys' fees when, on the conclusion of this case, it may be determined that they are entitled to those fees as having substantiated their claims." The Stillsons moreover maintained that the circuit court, sitting in equity, had the sound discretion to maintain the status quo pending a decision on the merits and reminded the circuit court that AOAO Maalaea Kai originally failed to "avail itself of the opportunity to post a supersedeas bond within the period of time allowed" to stay enforcement of the judgment.[10] The Stillsons further explained that AOAO Maalaea Kai "has recorded a [l]ien as to at least part of the amounts in controversy."

On July 21, 2000, the circuit court held a hearing on AOAO Maalaea Kai's request for order of repayment. At the hearing, AOAO Maalaea Kai's attorney argued that

[the Stillsons] have money that belongs to us, that there's no basis for them to hold onto that money. If they believe they are going to win on the seventy-five percent issue, they will have opportunity to collect from us. We have sufficient assets, [AOAO Maalaea Kai], and they have been assured sufficient assets, so there's no basis to hold onto—these funds don't belong to them.

If your Honor is at all inclined to let them hold onto the money, they should at least be required to post bond in the amount of one hundred fifty percent of the amount at issue. That will give us some protection that the money will be there when we're ready to collect it.

Again, we are ready to collect it now. There's no reason to hold onto it. They have been holding onto it for over a year, and the interest by the way on that as of July 31, assuming it takes us ten days to repay nine thousand six hundred ninety dollars and forty-seven cents, which would mean the total amount they should be repaying to us is eighty-two thousand four hundred sixty-eight dollars and forty-nine cents. That is a considerable sum of money for these individuals, and we are concerned, your Honor, that they will be dissipating their assets in the meantime.

(Some formatting omitted.) The circuit court, however, responded that

[a]fter reviewing this matter, the [c]ourt notes that [AOAO Maalaea Kai] could have posted a bond on this matter and not ended up being garnished, and there wouldn't have been any transfer of funds. The matter is still in flux as far as what the final resolution of the case is going to be.

It appears, also, from the record that [AOAO Maalaea Kai] has a lien on the

---

1999, the circuit court entered its garnishment order regarding American Savings Bank, garnishing $72,778.00 from AOAO Maalaea Kai's account, which included post-judgment attorneys' fees and costs.

9. HRS § 636–16 provides:

In awarding interest in civil cases, the judge is authorized to designate the commencement date to conform with the circumstances of

each case, provided that the earliest commencement date in cases arising in tort, may be the date when the injury first occurred and in cases arising by breach of contract, it may be the date when the breach first occurred.

10. The circuit court declined to grant AOAO Maalaea Kai's request for relief from its failure to post a supersedeas bond within the period of time allowed, and, thereafter, permitted the Stillsons to enforce the judgment.

apartment to secure its position, and so under those circumstances I am not going to take any action at this time to require repayment. I am going to deny the motion.

The circuit court subsequently denied AOAO Maalaea Kai's request for repayment of the monies obtained by the Stillsons in satisfaction of the January 14, 1999 amended judgment.

5. *Remand Proceedings*

On July 20, 2000, the Stillsons filed a motion for partial summary judgment on the first remanded issue, arguing that AOAO Maalaea Kai violated HRS § 514C–6(a) by purchasing the fee interest without the requisite seventy-five percent approval, and, therefore, the Stillsons should not be compelled to pay their proportionate share of the expenses incurred in acquiring the fee. AOAO Maalaea Kai filed a cross-motion for summary judgment, maintaining that it met the requirements of HRS § 514C–6(a), and, in the alternative, if the circuit court determined that it failed to obtain seventy-five percent approval, the "savings provisions" of HRS §§ 514C–4 and 514C–6(b) validated the fee purchase, which the circuit court subsequently denied.

On October 4, 2000, a hearing was held on the Stillsons' motion. AOAO Maalaea Kai argued that the "one vote per unit" method set forth in the bylaws applied to the fee purchase. The Stillsons, however, proffered a fractionalized voting construct:

[STILLSONS' COUNSEL]: Let me give you a real basic example.

In this case, you had, I believe, varied categories of apartments. There is one category, the smaller units represented approximately .94 percent of the common interest. And then there was another category of apartment[s] that represented 1.414 of the common interest. I think there might have been one in between. But let's just say those two, you have two apartments, a large apartment and a small apartment.

Okay. And let's first posit just to illustrate how this weighting mechanism works. If there is one lessee of a given

apartment, and that apartment represents 1.414 of the [percentage common interest (]PCI[) ] and that individual voted in favor of the fee conversion, then 1.414 would go into the percentage or into the account to determine if the [seventy-five] percent requirement was made, was met.

Now, let's say that that particular apartment, the 1.414 has two owners, okay, two lessees. Our position is in order for that 1.414 to be counted, both lessees have to vote in favor of the fee conversion.

If only one votes, then half of that 1.414 would count and we give them credit. We don't throw out the vote.

We give them credit for each lessee that actually signed the consent.

THE COURT: So your position is that both have to vote to count the unit?

[STILLSONS' COUNSEL]: To count the 1.414.

THE COURT: What if only one votes?

[STILLSONS' COUNSEL]: Then you count half of the PCI. And that is clearly what the legislature—I mean, that is clearly what the statutory language says, when it refers to the lessees voting the percentage common interest appurtenant to their apartments.

At the conclusion of the hearing, the circuit court granted the Stillsons' motion for partial summary judgment, ruling as follows:

Based on the arguments that have been presented and the record that is before the [c]ourt here, and the memorandums of [c]ounsels, the [c]ourt is going to find that the 1995 ballot is the act in issue that requires the 75 percent vote, which is required by [HRS § ] 514C–6(a), which it refers to in the remand from the Supreme Court in this case.

And so the question is whether that standard was met, and also whether, if it was, whether the conversions surcharge was assessed in a fair and equitable manner.

The [c]ourt is convinced that the—under the plain reading of the statute, the [Stillsons'] view of that it must be [seventy-five percent] of the lessees, [seventy-five] who hold [seventy-five] percent of the common

interest [a]ppurtenant is the common view. And based upon the record before the [c]ourt, finds that that was not the case in this situation.

And then, and it also finds there was no ratification by the [Stillsons] and that there was no ratification by the subsequent DROAs or deeds, and finds also that the—both with respect to DROA and deeds, using the standard that I have just stated for [HRS § ] 514C–6(a) was less than [seventy-five] percent in each case.

On the question of the so-called savings clauses which are [HRS §§ ] 514C–4 and 514C–6(b), it is the [c]ourt's view that that does—is not—does not contemplate vitiating the [seventy-five] percent requirement at [HRS § ] 514C–6(a). It may well be that the—that the transfer could not be attacked by the lessor or other parties, but it does not justify the assessment of the surcharge against the defendants where the [seventy-five] percent requirement of [HRS § ] 514C[–6(a) ] was not met.

Then the next question is whether or not Act 241, which seems to, on its face, apply retroactively.

The [c]ourt finds that it was the intention of the legislature to in fact do that, based on the fair reading of the language of the act itself. But under the Koolau Ranch case finds that is a violation of obligations of contract under Article 1 Section 10 of the United States Constitution. And so I will hold that that does not apply to the situation of the [Stillsons] and therefore the convergence surcharge was not fairly and equitably imposed and the request will be granted.

On November 29, 2000, the circuit court entered its written FOFs, COLs, and order granting the Stillsons' motion for partial summary judgment on Count I of their counterclaim, concluding that AOAO Maalaea Kai failed to meet the statutory seventy-five percent lessee approval threshold:

### FINDINGS OF FACT

1. In its Memorandum Opinion, filed herein on February 28, 2000, the Supreme Court ruled that [AOAO Maalaea Kai's] purchase of the subject leased fee interest in the land was governed by [HRS § ] 514C–6(a).

2. The Supreme Court thereupon remanded this cause for a determination of whether [AOAO Maalaea Kai] met the requirements of [HRS § ] 514C–6(a).

3. [AOAO Maalaea Kai] sought to meet the requirements of [HRS § ] 514C–6(a), *inter alia*, through the 1995 Written Consent to an amendment of [AOAO Maalaea Kai's] bylaws.

4. Fewer than [seventy-five percent] of the unit lessees actually signed the 1995 Written Consent.

5. The 1995 Written Consent was signed by unit lessees representing 66.9518% of the common interest.

6. Sales of units representing less than [fifty percent] of the common interest closed at the time of [AOAO Maalaea Kai's] purchase of the leased fee interest in February 1996.

7. [AOAO Maalaea Kai] began assessing the Stillsons a fee-conversion surcharge of $276.00 per month in March 1996.

### CONCLUSIONS OF LAW

1. [HRS § ] 514C–6(a) provides in relevant part:

The association of apartment owners or cooperative housing corporation may purchase the leased fee interest in the land; provided that at least seventy-five percent of the condominium unit lessees approve of the purchase.

2. [HRS § ] 514C–6(a) is unambiguous.

3. The quoted text may be read as requiring the affirmative vote of seventy-five percent [ ] of the condominium unit lessees, as weighted to reflect the percentage common interest appurtenant to each such unit, without creating a result that is absurd or inconsistent with the purposes of the statute.

4. [AOAO Maalaea Kai] failed to meet the [seventy-five percent] lessee approval requirement of [HRS § ] 514–C(6)(a) [sic] in purchasing the leased fee interest.

5. [AOAO Maalaea Kai's] conveyance of the fee interest appurtenant to certain condominium units to their respective owners after acquiring the fee interest did not validate the original purchase by "ratification."

6. The savings clause found in [HRS] §§ 514C–4 and 514C–6(b), to the extent either provision could be read as validating a purchase without [seventy-five percent] lessee approval, may not be read as allowing [AOAO Maalaea Kai] to assess the costs of acquiring the leased fee interest. To read the "savings" clause more broadly would vitiate the requirement of [seventy-five percent] lessee approval.

7. While the Legislature may have intended Act 241 to be retroactive, application of the "savings" clause to permit assessment of the Stillsons for a share of fee conversion costs, under the circumstances of this case, would violate the Contracts Clause of the United States Constitution.

ORDER GRANTING DEFENDANTS/COUNTERCLAIMANTS THOMAS HAYDEN STILLSON AND PHYLLIS ANN PAYNE–STILLSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Based on the foregoing [FOFs] and [COLs], IT IS HEREBY ORDERED:

1. The Stillsons' Motion for Partial Summary Judgment be and the same is hereby granted on Count I of the [c]ounterclaim;

2. Judgment shall be entered in their favor and against [AOAO Maalaea Kai] in the amount of $11,964.00, which represents the following:

| Fee conversion assessments | |
|---|---|
| (March 1996 through 7/1/97) | $ 4,772.80 |
| (7/2/97 through 12/31/97) | $ 1,422.90 |
| Reimbursement of Late Fees | $ 525.00 |
| Reimbursement of Interest | $ 194.71 |
| Attorney's fees and costs paid to [AOAO Maalaea Kai's] attorneys | $ 2,872.51 |
| Attorney's fees and costs paid to Pioneer Federal's attorneys | $ 1,092.17 |
| Costs (through 11/30/97) | $ 839.90 |
| Interest @ 10% from 1/14 to 4/1/99 | $ 244.01 |
| TOTAL | $11,964.00 |

(Some formatting omitted.) Judgment was subsequently entered in favor of the Stillsons and against AOAO Maalaea Kai on Count I of the Stillsons' counterclaim in the amount of $11,964.00 on December 27, 2000.

The Stillsons, however, filed motions to amend (1) the November 29, 2000 written FOFs, COLs, and order, and (2) the December 27, 2000 judgment, requesting the circuit court to include a protective provision precluding AOAO Maalaea Kai from further assessing them fee conversion surcharges, late fees, interest, and other related charges accruing after December 31, 1997. On February 27, 2001, the circuit court granted the Stillsons' motion to amend the November 29, 2000 FOFs, COLs, and order, amending the COLs by adding the following:

8. The Stillsons have no liability to [AOAO Maalaea Kai] for any sums relating to the purchase of the fee interest assessed after January 15, 2000, including any fee conversion expense or surcharge.

9. [AOAO Maalaea Kai] may not lawfully include in its periodic billing of maintenance or other common expenses rendered to the Stillsons any sums relating to the purchase of the fee interest, including any fee conversion expense or surcharge[,]

and the order by adding the following:

3. That [AOAO Maalaea Kai] be and the same is hereby permanently enjoined from collecting or attempting to collect from the Stillsons, or either of them, any fee, charge or assessment in connection with [AOAO Maalaea Kai's] purchase of the fee interest, including without limitation the billing of fee conversion expenses as an element of the common area maintenance expenses.

On April 9, 2001, the circuit court entered an order granting the Stillsons' motion to amend the December 27, 2000 judgment.

Thereafter, on April 10, 2001, the circuit court awarded the Stillsons $50,135.47 in attorneys' fees, costs, and expenses. An amended final judgment (1) awarding the Stillsons $51,839.30 [11] in fee conversion as-

11. The May 2, 2001 amended final judgment awarded the Stillsons "[a] money judgment in

sessments, late fees and interest, attorney's fees and costs, and costs and interest, and (2) permanently enjoining AOAO Maalaea Kai from collecting or attempting to collect any assessments related to the fee purchases from the Stillsons was subsequently entered on May 2, 2001. AOAO Maalaea Kai timely appealed.[12]

## II. DISCUSSION

**A. A logical reading of HRS § 514C–6(a) compels that only the percentage of common interest attributed to those units in which *all* of its lessees agreed to the fee purchase will count towards the requisite seventy-five percent necessary to approve a fee conversion.**

On appeal, AOAO Maalaea Kai first argues that the circuit court erred in finding and concluding that it failed to obtain the requisite seventy-five percent approval needed to purchase the fee, as required by HRS § 514C–6(a). AOAO Maalaea Kai's primary contention is the method of calculating the requisite seventy-five percent. Acknowledging that HRS § 514C–6(a) fails to expressly delineate how the seventy-five percent is calculated, AOAO Maalaea Kai argues that the appropriate, and seemingly rational method of calculation is "one vote per unit," as set forth in its by-laws. AOAO Maalaea Kai thus maintains that, in light of the "one vote per unit" method, at least seventy-five percent of the unit owners approved the fee

purchase based on the 1994 ballots, 1995 written consents, leased fee interest sales contracts, and limited warranty deeds.

The Stillsons, however, argue that the voting method prescribed under HRS § 514C–6(a) envisions a fractionalized computation—calculating the seventy-five percent approval requirement according to the interest actually owned by each lessee voting in the affirmative.

I agree with the Stillsons to the extent that all lessees are entitled to vote on the fee purchase. However, contrary to the majority's interpretation of the voting construct implicated under HRS § 514C–6(a), a more logical reading of HRS § 514C–6(a) delineates that, because the percentage of common interest appurtenant to each unit remains undivided, in order for a unit's percentage of common interest to count towards the requisite seventy-five percent approval prescribed under HRS § 514C–6(a), all lessees within the unit must affirmatively vote for the fee conversion. In other words, if a unit is owned by three lessees, and one lessee votes against the fee purchase, that unit's percentage of common interest appurtenant will not count towards the seventy-five percent approval required to validate a fee conversion, notwithstanding the affirmative votes of the remaining two lessees.

the amount of $51,839.30, representing fee conversion assessments, late fees and interest, [ ] attorneys' fees and costs, [and] costs and interest[.]" However, based on the circuit court's April 10, 2001 order awarding the Stillsons $50,135.47 in attorneys' fees, costs, and expenses—$104,970.68 in attorneys' fees and $7,682.62 in costs and reimbursable expenses, less $62,517.83 previously recovered—the May 2, 2001 amended judgment appears to miscalculate the actual amount awarded.

**12.** On appeal, AOAO Maalaea Kai raises fourteen points of error, which may be consolidated into the following seven arguments: (1) the circuit court erred in finding and concluding that AOAO Maalaea Kai failed to obtain approval from the requisite seventy-five percent of unit owners needed to purchase the leased fee interest in the Maalaea Kai Condominium pursuant to HRS § 514C–6(a); (2) the circuit court erred in determining that conveyance of the fee interest to respective unit owners after the fee was pur-

chased did not validate the original fee purchase by ratification; (3) the circuit court erred in concluding that the savings clauses found in HRS §§ 514C–4 and 514C–6(b), to the extent either provision could be read to validate the fee purchase without seventy-five percent approval, cannot be read to permit AOAO Maalaea Kai to assess costs resulting from the fee purchase and violated the Contracts Clause of the United States Constitution; (4) the circuit court erred in ruling that AOAO Maalaea Kai did not assess fee conversion expenses in a "fair and equitable manner," as mandated by HRS § 514C–6(a)(3); (5) the circuit court erred in awarding the Stillsons attorneys' fees, costs, and expenses; (6) the circuit court erred in ruling that AOAO Maalaea Kai was not entitled to repayment of the January 14, 1999 amended final judgment; and (7) the circuit court erred in determining that the Stillsons were not liable to AOAO Maalaea Kai for any expenses incurred in the fee conversion.

1. *The plain language of HRS § 514C–6(a) dictates that approval of a fee conversion is valid if the lessees of units to which at least seventy-five percent of the common interests are appurtenant approve of the purchase.*

Under Hawaii's Condominium Leased Fee Purchase Act, condominium associations have authority to purchase the leased fee interest in the land under a condominium project. Specifically, pursuant to HRS § 514C–6(a),

> [t]he association of apartment owners or cooperative housing corporation may purchase the leased fee interest in the land; provided that *at least seventy-five per cent of the condominium unit lessees or cooperative unit lessees approve of the purchase.* If the seller is also a condominium unit lessee or cooperative unit lessee, the seller's interest shall be disregarded in the computation to achieve the seventy-five per cent requirement. As used herein, *seventy-five per cent of the condominium unit lessees means the lessees of units to which seventy-five per cent of the common interests are appurtenant*[.13]

(Emphases added.) Indeed, the plain language of HRS § 514C–6(a) expresses that approval of the fee purchased by the association of apartment owners is effective as long as the lessees of units to which at least seventy-five percent of the common interests are appurtenant approve of the purchase. HRS § 514C–6(a), however, does not expressly delineate the method used in calculating the requisite seventy-five percent when a unit is held by more than one lessee.

2. *The majority's reliance on AOAO Maalaea Kai's bylaws to proffer a "one vote per unit" voting method is misplaced.*

The majority posits that AOAO Maalaea Kai's bylaws "control on the question of how the votes are to be calculated." Majority at 8–11, 116 P.3d at 650–53. Relying on HRS § 514A–81, the majority implicates AOAO Maalaea Kai's bylaws to propose the "one vote per unit" voting construct under HRS § 514C–6(a). I disagree with the majority's importation.

" 'Operation of the property' means and includes the administration, fiscal management, and operation of the property and maintenance, repair, and replacement of, and the making of any additions and improvements to, the common elements." HRS § 514A–3. As contemplated under HRS § 514A–3, "operation of the property" necessarily entails the maintenance, management, and daily operations of the condominium property. Indeed, voting on the purchase of a leased fee interest does not encompass the maintenance or management of the condominium property, and is not a function of the condominium property's daily operations. Nevertheless, the majority insists, through application of the dictionary definition of "administration," that "voting on the leased fee purchase is implicated in the 'administration' of the property[,]" inasmuch as "voting procedures would constitute 'practices' and 'rationalized techniques' that associations 'employ[ ] in achieving the objectives or aims of an organization[.]' " Majority at 8–9, 116 P.3d at 650–51 (some brackets in the original and some added). The majority's assertion is inapposite. In the context of the "operation" of the condominium property, as contemplated under HRS § 514A–3, voting on the purchase of a leased fee interest by a condominium association does not fall within the scope of its "administration." Accordingly, conversely to the majority's interpretation, it cannot reasonably be inferred that voting on the purchase of a leased fee interest falls within the scope of "operation of the property" so as to be governed by AOAO Maalaea Kai's bylaws.

Moreover, the majority's steadfast adherence to AOAO Maalaea Kai's bylaws to interpret the voting method contemplated under HRS § 514C–6(a) is misguided. AOAO Maalaea Kai's bylaws dictate the "one vote per unit" voting method expressly in terms of voting at board meetings—not for fee purchases:

---

**13.** The legislative history of HRS § 514C–6(a) does not provide any reason behind, or the significance of, requiring seventy-five percent approval. *See* Sen. Conf. Comm. Rep. No. 214, in 1988 Senate Journal, at 674; Hse. Conf. Comm. Rep. No. 88–88, in 1988 House Journal, at 799.

2. *Voting Owners.* There shall be one "Voting Owner" of each apartment. The voting owner, who need not be an owner, shall be designated by the owner or owners of each apartment by written notice delivered to the Board of Directors.... In the absence of any such designation, the owner or owners of an apartment shall be deemed to be the voting owners of such apartment, and, if any apartment be owned by more than one owner (and whether such owner shall hold such apartment jointly, commonly or by the entireties), any one of such owners present in person at any meeting of the Association shall be deemed to be the voting owner of such apartment, and if there be more than one of such owners present at any meeting, and if there be any dispute among them as to which of them shall be deemed to be the voting owner of such apartment, then the majority of them then present shall select a voting owner[.]

As such, AOAO Maalaea Kai's bylaws are tangential.

The majority, however, implores application of the "voting owner" provision set forth in AOAO Maalaea Kai's bylaws. Looking outside the governing statute, the majority advocates the "one vote per unit" method, focusing on the required contents of a condominium association's declaration, as set forth under HRS § 514A–11(6):

> The "voting owner" provision in the by-laws is consistent with the Condominium Property Act, chapter 514A. HRS § 514A–11(6) (1993) mandates that condominium association declarations "shall express ... [t]he percentage of undivided interest in the common elements appertaining to each apartment and its owner for all purposes, including voting[.]" Thus, [AOAO Maalaea Kai's] bylaws, requiring multi-owner apartments to designate a representative "voting owner" for purposes of casting a vote, comports with HRS § 514A–11(6), which mandates an "owner" for the purpose of "voting" be identified in the declaration.

Majority at 10, 116 P.3d at 652 (ellipsis in the original) (some brackets in the original and some added) (footnotes and emphasis omitted). Inasmuch as AOAO Maalaea Kai's dec-

laration was recorded on April 9, 1974, prior to the enactment of the "Condominium Property Act," no owner designation was declared. Nevertheless, the plain reading of HRS § 514A–11(6)'s "owner" designation does not necessitate a "single" or "sole" designee. If the legislature desired a single "voting owner" designation, it could have easily required as much. The legislature, however, designated only the requirement that a condominium association's declaration include each condominium units "owner for all purposes, including voting." Thus, "multi-owner apartments" are not mandated to designate a single representative for purposes of voting.

3. *A logical reading of HRS § 514C–6(a) delineates that a condominium association has authority to purchase the fee interest in the land if the units in which all of its lessees voted in the affirmative, as weighted to reflect each unit's percentage of common interest, collectively amounts to seventy-five percent.*

Indeed, in construing the method of calculation implicit in HRS § 514C–6(a), this court must be mindful of its duty with respect to statutory construction:

> [When construing a statute, this court must] ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And *we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.*
>
> . . . .
>
> *This court may also consider the reason and spirit of the law,* and the cause which induced the legislature to enact it ... to discover its true meaning. Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

*State v. Sullivan,* 97 Hawai'i 259, 262, 36 P.3d 803, 806 (2001) (citations and internal quotation marks omitted) (emphases added). Thus, "[a] rational, sensible and practical in-

terpretation [of a statute] is preferred to one which is unreasonable or impracticable." *Bowers v. Alamo Rent–A–Car, Inc.*, 88 Hawai'i 274, 277, 965 P.2d 1274, 1277 (1998) (explaining that, because the legislature is presumed not to intend an absurd result, legislation should be construed to avoid, if possible, inconsistency, contradiction, and illogicality) (internal quotation marks and citation omitted) (some brackets in the original and some added). Accordingly, if the legislature intended "one vote per unit," as AOAO Maalaea Kai and the majority proffer, it would have expressly provided as much. The simple fact that this voting mechanism is not expressly provided for under HRS § 514C–6(a) is telling.

Consistent with established statutory construction principles, a logical reading of the method of calculating the seventy-five percent threshold requirement implicated under HRS § 514C–6(a) designates that each lessee holding an interest in a unit vote in the affirmative for that unit's percentage of common interest to be attributed to the seventy-five percent threshold. HRS § 514C–6(a) specifically instructs that "seventy-five per cent of the condominium unit lessees means the lessees of units to which *seventy-five per cent of the common interests are appurtenant*[.]" (Emphasis added.) The common interest is "the percentage of *undivided* interest in the common elements appertaining to each apartment, as expressed in the declaration, and any specified percentage of the common interests means such percentage of the undivided interests in the aggregate." HRS § 514A–3 (emphasis added). A condominium unit lessee, moreover, is "an *individual or individuals* owning or leasing a condominium unit situated on leasehold land." HRS § 514C–1 (emphasis added). Reading HRS §§ 514A–3, 514C–1 and 514C–6(a), *in pari materia*, compels that (1) each lessee holding an interest in a unit be allowed to vote on the fee purchase, and (2) in order for a unit's attributed percentage of common interest to count towards the requisite seventy-five percent threshold necessary to approve the fee conversion under HRS § 514C–6(a), each lessee within the unit must vote in the affirmative.[14] For example, as previously illustrated, if a unit is owned by three lessees and one lessee votes against the fee purchase, that unit's percentage of com-

14. The majority faults my interpretation of the voting construct implicated under HRS § 514C–6(a) as a "piecemeal reconstruction of HRS § 514C–6[,]" claiming that the "import[ation] of definitions from outside the governing statute, HRS § 514C–6, would not produce a correct result." Majority at 8 n. 8, 116 P.3d at 650 n. 8 (emphasis omitted). The majority further avers that

[i]t would appear evident that if the legislature desired that every lessee holding an interest in a single apartment vote in the affirmative before the PCI in the apartment would be attributed to the 75% threshold, it could have easily required the "unanimous" consent of all owners of a condominium. The legislature, however, designated only the ultimate condition in HRS § 514C–6(a), the requirement of an affirmative vote from 75% of the common interests appurtenant to the units, and not 75% of the common interests appurtenant to the units in which every individual lessee votes in the affirmative.

Majority at 8, 116 P.3d at 650. The majority's criticism is unavailing.

The legislature did not expressly delineate the method used in calculating the requisite seventy-five percent threshold *when a unit is held by more than one lessee*. As such, this court is duty-bound to read HRS § 514C–6(a) "in the context of the entire statute and construe it in a manner consistent with its purpose." *Sullivan*, 97 Hawai'i at 262, 36 P.3d at 806. In accord with this duty, I am mindful that "laws *in pari materia*, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993); *see also Barnett v. State*, 91 Hawai'i 20, 31, 979 P.2d 1046, 1057 (1999).

Hence, because the legislature did not define the voting method necessary to calculate the seventy-five percent threshold, I looked to the Condominium Property Act (HRS chapter 514A) and the Condominium Leased Fee Purchase Act (HRS chapter 514C), which govern condominium properties in Hawai'i, for guidance. Based on the plain definition of "common interest" delineated under the Condominium Property Act, and the plain definition of "condominium unit lessees" delineated under the Condominium Leased Fee Purchase Act, I construed HRS § 514C–6(a)'s designation to mean that each lessee holding an interest in a unit vote in the affirmative for that unit's percentage of common interest to be attributed to the seventy-five percent threshold. Reading *in pari materia* the definitions expressed by the legislature, and consistent with the purpose of Hawai'i's Condominium Leased Fee Purchase Act, my interpretation of the voting method implicated under HRS § 514C–6(a) is proper.

mon interest, in its entirety, will not count towards the requisite seventy-five percent, notwithstanding the affirmative votes of the other two lessees. It therefore follows that, in order to approve a fee conversion under HRS § 514C–6(a), the units in which all of its lessees voted in the affirmative, as weighted to reflect each unit's percentage of common interest, must collectively amount to seventy-five percent. The logical import of this voting mechanism is consistent with the legislature's intent to "protect the rights of both lessors and lessees[,]" *see* Sen. Stand. Comm. Rep. No.2094, in 1988 Senate Journal, at 903; Hse. Stand. Comm. Rep. No. 1061–88, in 1988 House Journal, at 1218, and "facilitate and encourage voluntary lease to fee conversions of condominium projects in an efficient and economical manner[,]" *see* 1999 Haw. Sess. L. Act 241, § 1 at 743. Thus, contrary to the "one vote per unit" method advanced by AOAO Maalaea Kai and the majority, and the fractional voting construct proffered by the Stillsons, a rational, and more preferable, interpretation of HRS § 514C–6(a), permits all unit lessees to vote on a fee conversion, and, only the percentage of common interest attributed to those units where all of its lessees voted in the affirmative will count towards the requisite seventy-five percent necessary to approve the fee conversion.

In the instant case, the circuit court was convinced that "under the plain reading of [HRS § 514C–6(a)], the [Stillsons'] view of that it must be [seventy-five] percent of the lessees, [seventy-five] who hold [seventy-five] percent of the common interest [a]ppurtenant is the common view." Thus, in granting partial summary judgment in favor of the Stillsons on Count I of their counterclaim, the circuit court concluded, *inter alia*, that HRS § 514C–6(a) "may be read as requiring the affirmative vote of seventy-five percent [ ] of the condominium unit lessees, as weighted to reflect the percentage common interest appurtenant to each such unit," and, subsequently, "[AOAO Maalaea Kai] failed to meet the [seventy-five percent] lessee approval requirement of [HRS § ] 514–C(6)(a) [sic] in purchasing the leased fee interest." Viewing these circumstances in the light most favorable to AOAO Maalaea Kai, there exists a genuine issue of material fact as to whether AOAO Maalaea Kai obtained the necessary seventy-five percent approval to validate the fee conversion. Summary judgment was therefore precluded with regard to the seventy-five percent requirement of HRS § 514C–6(a).

**B. Execution of the limited warranty deeds did not constitute "ratification" so as to affirm the 1995 written consents and approve the fee purchase.**

The majority maintains that more than 75% of the owners approved the fee purchase through "ratification[,]" inasmuch as

[b]y signing the deeds, any purportedly non-consenting owners "manifest[ed]" an "election" to "treat the act [of the signing owner] as authorized," thereby constituting affirmance of the 1995 consents. This affirmance, in turn, gave "effect [to any questionable consents] as if originally authorized" by the purportedly non-consenting owner and resulted in ratification.

Majority at 14, 116 P.3d at 656 (some brackets in the original and some added). The majority's assertion is misguided.

Ratification rests on principles of agency and is defined as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Maui Fin. Co., Ltd. v. Han*, 34 Haw. 226, 230 (Terr.1937) (citing Restatement of Agency § 82, at 197 (1933)). Such affirmance can be established by any conduct manifesting to treat an unauthorized act as authorized or conduct justifiable only if there were such an election. *Id.* (citing Restatement of Agency § 83, at 198 (1933)). Ratification, therefore, requires "(1) the existence of a principal[,] (2) an act done by a purported agent[,] (3) knowledge of the material facts by the principal[,] and (4) an intent by the principal to ratify the act." *Robertson v. Jessup*, 96 Or.App. 349, 773 P.2d 385, 387 (1989). In effect, "[t]he principal ratifies the prior act if, with full knowledge of the facts, he 'accepts the benefits of the acts' or assumes that an obligation is imposed." *In re Eicholz*, 310 B.R. 203, 208

(W.D.Wash.2004) (citation omitted). Consequently, any conduct manifesting an intent to treat an unauthorized act as authorized, such as the failure to repudiate a contract or an affirmative act "which can be justified only if there were an election to authorize the contract[,]" supports a finding of ratification. *Rayonier, Inc. v. Polson*, 400 F.2d 909, 915 (9th Cir.1968) (citations omitted).

In the instant case, AOAO Maalaea Kai conveyed the fee interest appurtenant to certain units through limited warranty deeds *after* it already purchased the fee. By signing the deeds, AOAO Maalaea Kai conveyed legal ownership of the property upon which the Maalaea Kai Condominium was situated to the unit owners:

> 8. *MERGER OF GRANTEE'S LEASEHOLD INTEREST AND THE PROPERTY.* ... Upon release of any and all such mortgages, liens or encumbrances, and provided that the owners of Grantee's Leasehold Interest and the Property are identical, it is the intent of the parties to this Deed that there be a merger of Grantee's Leasehold Interest into the Property. However, Grantor makes no promises or statements whether a merger of Grantee's Leasehold Interest into the Property will, in fact, occur at such time.

Execution of these deeds alone does not contemplate that the condominium unit lessees who previously voted against the fee purchase *intended* to thereafter ratify the 1995 written consents and ultimately approve the fee purchase. To do otherwise would circumvent the fee purchase process statutorily required under HRS § 514C–6(a). We cannot permit a condominium association to purchase a fee, absent the requisite threshold consent, and then attempt to thereafter validate the purchase through the execution of limited warranty deeds. This simply contravenes HRS § 514C–6(a) and the principles of ratification. In the absence of any other evidence, it cannot be said that there was a manifestation of assent or meeting of the minds to treat the negative votes as affirmative, so as to affirm the 1995 written consents, and, thus, approve the fee conversion. The circuit court was therefore correct when it concluded that "[AOAO Maalaea Kai's] conveyance of the fee interest appurtenant to certain condominium units to their respective owners after acquiring the fee interest did not validate the original purchase by 'ratification.' "

C. **An association of apartment owners must obtain the necessary seventy-five percent approval to validate a fee purchase under HRS § 514C–6(a) *prior* to purchasing the fee.**

AOAO Maalaea Kai contends that, because HRS § 514C–6(a) is silent as to the timing of the approvals needed to validate a fee conversion, "there is nothing which prohibits the obtaining of approvals even after the completion of the fee purchase." AOAO Maalaea Kai thus maintains that the circuit court improperly established an arbitrary cut-off date—the date AOAO Maalaea Kai purchased the fee—within which to calculate the seventy-five percent approval. The Stillsons, however, counter that the plain meaning of HRS § 514C–6(a)—namely, that AOAO Maalaea Kai has authority to purchase the fee interest "provided that at least seventy-five percent of the lessees approve of the purchase"—necessitates that "approval must *precede* the purchase." (Internal quotation marks omitted and emphasis in the original.) I agree with the Stillsons' interpretation.

HRS § 514C–6(a) expressly authorizes an association of apartment owners to purchase the leased fee interest in the land "provided that at least seventy-five per cent of the condominium unit lessees or cooperative unit lessees approve of the purchase." Although HRS § 514C–6(a) does not expressly define the time period within which the requisite approval must take place, the rational import of a condominium association's authority dictates that the necessary approval must be obtained prior to the fee purchase. To permit an association of apartment owners to first purchase a fee, and then obtain the necessary seventy-five percent approval, contravenes the legislature's intent in requiring seventy-five percent approval for fee conversions and is illogical. For example, if a condominium association first purchased the fee, and then failed to obtain seventy-five percent approval, the fee conversion would

be rendered void. This is clearly not what the legislature intended.

In the instant case, the circuit court limited its review of the seventy-five percent approval to the 1995 written consents and found that "[s]ales of units representing less than [fifty percent] of the common interest closed at the time of [AOAO Maalaea Kai's] purchase of the leased fee interest in February 1996." Inasmuch as the circuit court's review was limited to approvals obtained prior to the fee conversion, I do not believe the circuit court was wrong to limit its review as it did.[15]

### III. CONCLUSION

Based on the foregoing, I would vacate the circuit court's judgments and orders granting partial summary judgment in favor of the Stillsons and against AOAO Maalaea Kai on Count I of the Stillsons' counterclaim, awarding attorneys' fees, costs, and expenses, and permanently enjoining AOAO Maalaea Kai from collecting or attempting to collect from the Stillsons any costs related to the fee purchase, and remand to allow the circuit court to apply the voting method prescribed herein to determine whether AOAO Maalaea Kai obtained the necessary seventy-five percent approval to validate the fee purchase. If the circuit court determines that AOAO Maalaea Kai obtained at least seventy-five percent approval, the circuit court must then determine whether the fee conversion surcharge was assessed in a "fair and equitable" manner.

15. The majority implicitly concludes that approval of a fee purchase must be obtained prior to the association's purchase. Majority at 14–15, 116 P.3d at 656–57. The majority attempts to reconcile the timing dispute through the principles of "ratification," contending as follows:

Ratification has the effect of validating any original allegedly unauthorized act. Inasmuch as any purportedly unauthorized consents was later ratified, the "prior unauthorized" consents had "the same legal effect" as if the signing owner "originally had the prior authorization" of his or her co-owners and/or its official "voting owner."

Majority at 15, 116 P.3d at 657. Because I do not believe execution of the limited warranty deeds constituted "ratification" so as to affirm the 1995 written consents and approve the fee purchase, I would instruct the circuit court, on remand, to calculate the requisite seventy-five percent based on approvals obtained prior to AOAO Maalaea Kai's fee purchase.